WALKER'S ADM'X *v.* FARMERS' BANK.

*Mortgage—Deed Absolute from Mortgagor to Mortgagee—Trusts.*

A court of equity will look beyond the terms of the instrument to the real transaction, and will give effect to the actual transaction of the parties, and will treat a deed absolute in form as a mortgage, or a conveyance in trust for the payment of debts, or otherwise, in accordance with the object of the parties in executing and receiving the same, and any evidence, written or oral, will be admitted to show this.

But where, in the absence of any deception, undue influence, or other fraudulent means employed to procure a deed absolute in form, a party relies upon parol extrinsic evidence to prove that there was an agreement, understanding, and intention of the parties thereto that said instrument should be in effect a mortgage or security for the payment of an existing indebtedness, or a deed of trust to sell the lands thereby conveyed for the payment of the debts of the grantor out of the proceeds thereof, such parol proof must be clear, unequivocal, and convincing, or the presumption that the instrument is what it purports to be must prevail.

Notwithstanding the maxim "once a mortgage always a mortgage," a subsequent release of the equity of redemption for an adequate consideration may be made by the mortgagor to the mortgagee.

The use, *bona fide,* of a *levari facias,* when the mortgagee has a well grounded and reasonable apprehension of loss unless it immediately be issued and executed, is not of itself an inequitable pressure upon the mortgagor, even though he be enfeebled in body or distressed in mind by his embarrassed condition.

An amicable *scire facias* was docketed between the mortgagor and mortgagee. Defaults were made in payment of interest on the judgment; and writs of *levari facias* were issued, which were withdrawn upon settlement of the arrears of interest. The mortgagor sold part of the property at auction to pay off the mortgage, but the greater part was withdrawn, owing to the inability to get a bid high enough. This part, except one lot, was subsequently deeded by the mortgagor and wife to the mortgagee, who resold it at an advance over the mortgage debt. Prior to the execution of this deed, the wife had refused to sign it unless the mortgagee would agree to give her anything made over and above the mortgage. This was refused, and another *levari facias* was issued, but

withdrawn, the wife agreeing to join in the deed. *Held*, that as, in Delaware, a mortgage is only a security for the payment of a debt, and establishes no fiduciary relations between the parties to it, and as, at the delivery of the deed, the indebtedness of the mortgagor was discharged, and one lot covered by the mortgage was released to him, and as there was no inequitable use of the power of the mortgagee, nor inadequacy of consideration, the deed must be sustained. HOUSTON, J., dissenting.

(*June 21, 1888.*)

APPEAL from Court of Chancery.    Affirmed.

The administratrix of William Walker, deceased, filed a bill against the Farmers' Bank of the State of Delaware to have a deed absolute in form declared a mortgage, and for an accounting.    Decree was rendered for defendant, the Chancellor delivering the following opinion :

SAULSBURY, Ch.    On the eighth day of November, 1873, William Walker executed a bond and mortgage, in favor of the president, directors, and company of the Farmers' Bank of the State of Delaware, for the sum of $22,406.37.    Mrs. Walker joined in the mortgage.    Fifteen different parcels of land were conveyed by this mortgage.    An amicable *scire facias* was docketed between the Bank and Walker and wife on this mortgage, the twenty-third day of March, 1876, and judgment thereon was recovered by the bank against them for the said sum of $22,406.37, with interest from April 18, 1875.    The interest due by Walker and wife to the bank on this judgment being in arrear, a *levari facias* was issued on said judgment on the twenty-sixth day of January, 1881, proceedings on which were subsequently abandoned, Walker having made arrangements for the payment of his arrears of interest.    The interest being again in arrear, a second *levari facias* on said judgment was issued on the eighth day of February, 1882.    Walker again making provisions for the payment of his arrears of interest, proceedings under the second writ of *levari facias* were abandoned.    On the fourteenth day of February, 1883,

a third writ of *levari facias* was issued on said judgment; Walker being again in arrear with his interest, and the principal of said judgment being wholly due and unpaid.  On the twenty-second day of February, 1883, Walker and his wife executed a deed of conveyance to the bank for nine different parcels of the above-named lands,—five of said parcels haveing been sold at public sale by Walker, in the month of December previous; and one of said pieces, called the "DryHouse Lot," being omitted from said deed, for reasons clearly stated by witnesses who have been examined in the cause.  The consideration stated in the deed seems to have been nominal, being the sum of $26,000,—the real consideration, as proved by the witnesses, being the release by the bank to Walker of his entire indebtedness to the bank, which then amounted to the sum of $25,277.36; also the payment by the bank of a mortgage in favor of one Bespham, on which there appears to have been due about $6,988.67; and the payment of a judgment of one Pearson against the said Walker, on which was then due about $85.  The Dupont mortgage had been theretofore assigned to the bank.  It and the Bespham mortgage and the Pearson judgment were liens upon the lands of Walker.  The entire indebtedness of Walker to the bank, and on account of prior liens which the bank assumed to pay, and did pay, on the twenty-second day of February, A. D. 1883,—the date of the deed from Walker and wife to the bank,—was the sum of $32,351.32.  The bank subsequently, at private sale, disposed of all these nine parcels of land conveyed to it by Walker and wife.  The prices for which the bank sold these parcels aggregated the sum of $34,870.  Of these, six sold for $3,370; leaving, for three parcels, $31,500.

The bank, in its answer, says that by far the greater part in value of these lands were sold by it on credit, and the consideration price for most of them has not yet been received by it, but remains unpaid; but it admits that the aggregate price for which it sold them exceeds the consideration price for which Walker sold

them to the bank, to the amount of between twenty-two and twenty-three hundred dollars. The bill was filed by Walker, in his lifetime, against the bank, to compel the payment by it of this amount, which he claims was equitably due him from the bank.

The question in the case is whether the deed of the twenty-second day of February, A. D. 1883, absolute in its term, is to be allowed to have force and effect according to its import, or be declared, as between the parties, to have the effect of a mortgage for the security of the subsisting debt. The determination of this question depends on the manner in which the deed was procured, and the objects and purposes contemplated by the parties, and upon the intention of the parties at the time it was executed, as shown by all the surrounding facts and circumstances. The relation of mortgagor and mortgagee, existing between the parties at the time of the execution of the absolute deed in question, should cause the court, as has been often said in other cases, to view with distrust, and to scrutinize with closeness, the negotiation that led to the making of the deed whereby it is now claimed that the right of redemption has been extinguished, and the previous mortgage converted into an absolute sale; or, in other words, whereby the complainant is debarred the right of recovering from the defendant the excess of amount of sales of the mortgaged property over the amount of the indebtedness of the complainant to the defendant at the time of the execution of the mortgage. To sustain such a transaction as the sale, without the right of redemption, it requires that all the circumstances attending it should be perfectly fair, and free from the least taint of advantage and imposition.

While it is everywhere now recognized as true, whatever heretofore may have been the difference of opinion on that subject, that a mortgagee may become the purchaser of the equity of redemption, if he does not use his power over the estate, where he has such power, to induce the mortgagor to part with his interest in it, it is nevertheless the policy of the law to prohibit the conversion of a real mortgage into a sale. *Conway v, Alexander*, 7 Cranch, 218.

Though the equity of redemption may be sold or disposed of to the mortgagee, yet unless the transaction appears to be fair, and unmixed with any advantage taken by the mortgagee of the necessituous circumstances of the mortgagor, equity will hold the parties to their original relation of debtor and creditor. *Dougherty v. McColgan*, 6 Gill & J., 275.

In the case of *Laugher v. Merryman*, 22 Md., 185, the court, say : " As the debt was not the appellee's, and for which she was not personally bound, if the property was really worth more than the mortgage debt at the time, the appellant paid nothing for the right of redemption." Again : " That the proposal to convert the mortgage into a sale was made and urged by the appellant is fully admitted in his answer ; the alternative proposed, being either an absolute sale of the property, or an immediate foreclosure and sale. That the appellee was distressed and perplexed with such an alternative, persistently pressed upon her, it is not difficult to conceive, and, as a fact, is fully shown by the proof in the cause. She had, in fact, no power of escape. Having agreed to a decree for a foreclosure, the only chance of avoiding being turned out of house and home summarily was by yielding to the appellant's demand for an absolute deed. This was an improper use of the mortgagee's power over the estate, to influence the mortgagor to part with the right of redemption, and such as a court of equity will not sanction." In this case the mortgagee sold the mortgaged premises for more than twice the amount of the mortgage debt; and this is at least some evidence of that inadequacy of price against which a court of equity will relieve. In this case the judge remarked that, from a careful reading of the record, he was convinced that there was an understanding that, though the deed was absolute on its face, it was to be regarded only as a means of better securing the appellant's debt, and that the surplus to arise from the sale of the property after payment of the mortgagee's debt was to be accounted for to the appellee. Surely there were sufficient reasons in this case for a decree in favor of the appellee, without referring to her

distress and vexation, which reference was wholly unnecessary. All debtors, probably, are distressed when their property has to be sold for the payment of their debts; but distress and anxiety on account thereof afford, of themselves, no ground for equitable interposition. There is no doubt but that, in equity, a conveyance, whatever form it may assume, will be treated as a mortgage whenever it appears to have been taken as a security for an existing debt, or a *contemporaneous loan,* and the inclination of the court is in doubtful cases so to treat it, and allow the grantor to redeem.

In the case of *Hinkley v. Wheelwright,* 29 Md., 348, the court say : " Nor does the fact that parties stand in the relation of mortgagor and mortgagee prevent their dealing with each other as vendor and purchaser of the equity of redemption. Such transactions will not be set aside unless for *manifest unfairness, or inadequacy of consideration.*"

In *Hicks v. Hicks,* 5 Gill & J., 85, it was said by the court that a mortgagee may become the purchaser of the equity of redemption, if he does not make use of his incumbrance to influence the mortgagor to part with his property at *less than its value.*

Lord Redesdale, in the case of *Webb v. Rorke,* which was a case in which the bill prayed that a lease of 999 years of nine acres of land which had been mortgaged to Rorke, who subsequently took the said lease from the mortgagor, and which also prayed that the mortgage deeds and bonds might be brought into court, and that the defendant might be decreed to reassign the lease to the plaintiff, and that the same might be decreed void, and that the defendant might account for the real value of the lands from the date of the lease, in decreeing in favor of the plaintiff, remarked : " Another objection was that this decision may tend to impeach dealings between mortgagor and mortgagee for the equity of redemption. But to this, he says, a good answer was given at the bar. " The cases are totally different. The parties stand in a different relation. If there be two persons ready to purchase, the mortgagee and another, the mortgagor stands equally between them ;

and, if the mortgagee should refuse to convey to another purchaser, the mortgagor can compel him, by applying the purchase money to pay off the mortgage. *It can therefore only be for the want of a better purchaser* that the mortgagor can be compelled to sell to the mortgagee." He says, however, that courts view transactions of that sort between mortgagor and mortgagee with considerable jealousy; and will set aside sales of the equity of redemption where, by the influence of his incumbrance, the mortgagee has purchased for *less than others would have given,* and there were circumstances of misconduct in his obtaining the purchase.

It was said in *Russell v. Southard,* 12 How., 154, in referring to strong expressions by judges in some of the cases of dealings between mortgagor and mortgagee, that strong expressions with reference to the particular facts under consideration, however often repeated by subsequent writers, cannot safely be taken as fixing an abstract rule. "We think," say the court, that inasmuch as the *mortgagee in possession* may exercise an undue influence over the mortgagor, especially if the latter be in needy circumstances, the purchase by the former of the equity of redemption is to be carefully scrutinized when fraud is charged; and that only constructive fraud, or an unconscientious advantage which ought not to be retained' need be shown to avoid such a purpose."

But we are unwilling to lay down a rule which would be likely to prevent any prudent mortgagee in possession, however fair his intentions may be, from purchasing the property, by making the validity of the purchase depend on his ability afterwards to show that he paid for the property all that any one would have been willing to give. We do not deem it for the benefit of mortgagors that such a rule should exist. The Farmers' Bank was not a mortgagee *in possession,* at the time the conveyance was made to it by Walker and wife.

The doctine upon this subject is very clearly stated in the case of *Villa v. Rodriguez,* 12 Wall., 339, by Mr. Justice SWAYNE, in delivering the opinion of the court. He says: "The law upon

the subject of the right to redeem, where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by jealous and salutory policy. Principles almost as stern are applied as those which govern where a sale by a *cestui que trust* to his trustee is drawn in question. To give validity to such a sale by a mortgagor, it must be shown that the conduct of the mortgagee was in all things fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him."

Where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instrument employed is immaterial. That the mortgagor knowingly surrendered, and never intended to reclaim, is of no consequence. If there is vice in the transaction, the law, while it will secure the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such should be the law.

It has been truly remarked by Pomeroy, in his Equity Jurisprudence, (volume 3, 146,) "that in no other department has the equity jurisprudence, as administered in this country, departed so widely from that administered in England, as in the department that is concerned with mortgages and the respective rights, liabilities, and remedies of the mortgagor and mortgagee." "No correct notion," he says, "can be obtained of equity as it now exists within the United States without an accurate and full appreciation of these differences. At the common law, the ordinary mortgage was to all intents and purposes a conveyance of the legal estate. A mortgage in fee immediately vested the mortgagee with the legal title, subject, however, to be defeated by the mortgagor's performing the condition by paying the money upon the prescribed pay-day."

In Delaware, a mortgage, as between the mortgagor and mortgagee, so long as the former continues in possession of the mortgaged premises, (which was Walker's situation,) is merely a security for the payment of money, and does not absolutely convey the legal title to the premises, but is a lien on the property of so high a nature that it is not divested by a sale on judgements subsequently obtained against the mortgagor. Yet if the mortgagee is in possession under the mortgage, and the condition of it be broken, it is no longer in the power of the mortgagor, nor of any one claiming his title by virtue of a sale on such a judgment, to recover the possession in ejectment. His only right in such a case is to redeem the premises by paying the mortgage. A mortgage in this State, being, but security for the payment of a debt, creates no trust, and establishes no fiduciary relation ; the mortgagee has but a chose in action. *Cooch v. Gerry*, 3 Har. (Del.), 282 ; *Hall v. Tunnell*, 1 Houst., 326; *Cornog v. Cornog*, 3 Del. Ch., 416. Such being the nature of a mortgage, and such being the relations between mortgagor and mortgagee, in this State, we must consider the allegations of the bill and answer in the cause ; examine the evidence in the cause, and apply the principles of equity, as judicially declared, to that evidence, so as to arrive at a just conclusion in respect to the controversy between the parties.

The bill expressly charges that the deed bearing date the twenty-second day of February, 1883, and executed by the complainant and his wife to the Farmers' Bank, was procured by deception and fraud, and that, had not the complainant and his wife been deceived, he would never had made an absolute deed to the bank, and that he believes his wife, Eliza S. Waker, would never have joined with him in executing the said deed had she fully understood the nature and purport of the said deed ; that it was contrary to the understanding of the complainant and his wife, when they made and executed the deed, that it should be an absolute deed in fee-simple. The bill alleges that the president, directors, company always insisted, before the execution of the deed by him

and his wife, that all they wanted was their actual debt, and gave him to understand, by their acts and conduct, that they would exact nothing more ; that the deed to the bank by Walker and wife was intended by them to be a deed to the bank for the payment of Walker's indebtedness, and was intended by them to be only a deed of trust for the sole and only purpose of liquidating and discharging Walker's indebtedness to the bank ; that certain directors of the said bank frequently, in presence of said Walker and wife, insisted that all the said bank wanted was its actual debt, and that the bank did not wish or desire Walker's property for speculative purposes, and that said language was employed by the agents, officers and directors of the bank to get Walker and his wife to make an absolute deed in fee-simple to the bank ; that the bank excepted the deed as a deed of trust from Walker and his wife for the sole and only purpose of discharging Walker's said indebtedness; and that the bank would pay over to Walker whatever surplus there might be after said indebtedness was fully paid and discharged.   Such, at least, is the contention of the complainants.   If these allegations and charges of the bill are proved to be true, there is an end of this case, and a decree should be entered in favor of the complainant, against the defendant, for the amount of the excess which the defendant has received from the sales of the lands conveyed by the complainant, Walker, to the defendant, or the excess of the sales of the land over the amount of said indebtedness.   In such case the defendant would be chargeable with the amount of sales, whether received by him or not, because it would not avail it, in this court, to allege and prove that the sales made by it were upon credit, and that a large portion of the amount of sales had not in fact been received owning to such credit having been given.

But the important question is, have these charges of the bill been proven ?   Are they supported by the evidence in the cause? There has certainly been no contract proved between the complainant and the defendant prior to the meeting at the house of Walker between Walker and his wife and the two Messrs. Ridgely, the

president and attorney for the bank, at which Mr. Watson and Harry A. Richardson were present. It is reasonable to infer, from the testimony, that prior to that time there had been conversations between one or both of the Ridgelys and Walker, in which Walker had suggested that, sooner than a public sale should be made of his lands, he would convey them to the bank; and that he had asked Edward Ridgely whether the bank would not sell his lands, and pay over the surplus beyond his indebtedness to him. There is no proof that both or either of them ever agreed to do so. Mr. Edward Ridgely states that such conversations and suggestions were made long before the meeting at Walker s house, and that the proposition was never seriously entertained. It seems, from the testimony of both the Messrs. Ridgely, that they had persistenly urged Mr. Walker to make sale of his lands himself, or by an agent, and thus pay off his indebtedness, or greatly reduce it. It is in proof that Mr. Walker, on ——— day of December, 1882, through Harry A Richardson, his agent, offered his lands at public sale in the town of Dover, which sale was well attended; and that, after selling six parcels of said land, the remaining parcels were withdrawn from sale, owing to the inability to obtain purshasers at an amount therefore as Mr. Walker judged proper. It was after the failure to realize from said sale a sufficient amount to pay Walker's indebtedness that the bank, as its attorney states in his testimony, seriously considered the propriety of taking from Mr. Walker a conveyance of his lands in payment of his indebtedness to it.

The meeting at Walker's house was, if I mistake not, early in the first week of February following. It appears, from the testimony, that that meeting was at the instance and upon the invitation of Mr. Walker, with a view of making arrangements as to his indebtedness to the bank. Walker submitted an estimate of what he supposed to be the value of his real estate, and assured the Messrs. Ridgely that it was more than sufficient to pay his indebtedness. They did not agree with him in opinion, and asserted that the bank would be the loser of a portion of their debt by reason of the insufficiency of his real estate to pay it.

It is in proof, and uncontradicted, that Walker, at that inter-view, proposed to deed all his real estate remaining unsold to the bank, with the exception of what is called the " Dry House Lot," which, for reasons stated by him, he would not include in the con-veyance in discharge of his indebtedness.    They insisted that the " Dry House Lot " should be included in the conveyance, and at first, as stated by Mr. Watson, declined to lay Mr. Walker's prop-osition before the board of directors of the bank, who were to meet that morning.    After considerable contention as to whether the " Dry House Lot " should or should not be included in the convey-ance between Walker and the Ridgelys, they stated that they would lay Walker's proposition before the board of directors.   It is proved that it was laid before the board, and that, after some consideration, it being considered that the costs of a sheriff's sale of the real estate of Walker would about equal in amount the sum which the bank would receive from a sale of the " Dry House Lot," after paying prior mortgages and liens thereon, the board of directors of the bank agreed to accept Mr. Walker's proposition, and instructed their attorney to notify Mr. and Mrs. Walker thereof.   He did so notify them immediately ; and, in pursuance of the agreement, afterwards, and perhaps the next day, set about preparing a deed of conveyance by Walker and wife to the bank for the nine parcels of land of Walker remaining unsold, exclusive of the " Dry House Lot."    After the preparation of the deed had been commenced, it is proved by the attorney of the bank that he received from Mrs. Walker, wife of William Walker, a note stating that she had recon-sidered her determination about signing the deed, and that she would not sign the deed conveying Walker's land to the bank unless the bank would pay to her the surplus of sales of said land that should remain after discharging Walker's indebtedness to the bank.    The preparation of the deed was thereupon suspended.

At the next meeting of the board of directors the attorney of the bank stated to the directors that he had received such a note from Mrs. Walker.   The note was shown to the directors, and, as

proved in the cause, they unanimously rejected Mrs. Walker's proposition, and refused to accept a conveyance of the land upon the conditions proposed by her. They also, as stated by Mr. Ridgely, the attorney, ordered him to proceed by *levari facias,* and sell the lands of Mr. Walker for the payment of their debt. The attorney states that he immediately informed Mr. Walker and his wife of this action of the board of directors, and proceeded to act in conformity with the instructions of the bank.

The third *levari facias* was issued, but proceedings under it, he states, were temporarily suspended at the instance of Mrs. Watson, a daughter of William Walker, until Harry A. Richardson, who was absent from town, should return from New York. Upon Mr. Richardson's return home, he called upon the attorney of the bank, inquired what was the matter in the Walker business; and being informed of the situation of matters owing to the reception of the note from Mrs. Walker, and rejection of its terms by the bank, he, (Richardson,) as stated by Mr. Ridgely, told him to go on and prepare the deed, and he would have it signed. The deed was prepared and taken by Mr. Richardson to Walker's, and signed and executed by Walker and his wife, and returned by Richardson to the attorney of the bank.

Some stress was laid in the argument upon the fact that Mr. Richardson stated that, when he received the deed to be taken to Walker's, Ridgely requested him to induce Walker and wife to sign it. Ridgely says he does not remember, and does not believe, he made that remark. It does not seem material, however, whether he did or not, for it does not appear in evidence that Mr. Richardson, the son-in-law, held out inducement to Walker and wife to sign the deed. He expressly says that nothing was said about paying over a surplus to Walker and wife, but that he should not have advised the sale of all Walker's lands to the bank if it had not have been to avoid a forced sale. By forced sale Mr. Richardson, I suppose, must have meant a sale by the sheriff under the *levari facias* which had been issued by the bank on its judgment obtained upon *scire*

*facias* against Walker. There can be no doubt that the bank had a perfect legal right to cause this writ to be issued on its judgment, and to have it promptly executed by the sheriff of Kent county, where Walker's lands were situate. That was a right of the bank, to the exercise of which Mr. Walker had no legal right to object. It was a right the exercise of which this court would have had no authority to prevent, if its restraining power had been invoked. Nor is this kind of incumbrance which the decisions above referred to contemplate, and which they declare a mortgagee in possession shall not use to obtain a conveyance from the mortgagor of his real estate. It was but the employment of the prescribed form of legal process for making the money due by the defendant to the plaintiff on a judgment legally recovered in a court of law. It is true this process is called a *levari facias*, and is executed upon specific lands, instead of upon lands generally; but this in nowise affects the legality or the equity of its use, where it is the prescribed and appropriate process. A mortgagee may even purchase at his own sale, without becoming a trustee for the mortgagor.

There is no difference in the testimony of Mrs. Watson, Harry Richardson, and the Messrs. Ridgely in respect to the consideration of the deed executed by Walker and wife in favor of the bank. It is true that Mrs. Watson and Mr. Richardson testify as to declarations made by both the Messrs. Ridgely, during the interview at Walker's, as to the bank being a rich and powerful corporation, and as to its being able to give better terms than Walker could give to the purchase of his real estate; but it must be remembered, even if such declarations are taken to be proved, that the chief contention in that conversation was as to the value of Walker's real estate, and as to its sufficiency to pay his indebtedness to the bank, and whether the "Dry House Lot" should be included in any conveyance that might be made by Walker and wife to the bank, or whether the said lot should not be included therein. Walker insists that his other real estate was amply sufficient to discharge his indebtedness to the bank without a conveyance of that lot, and the

Ridgelys contend that the whole of the real estate would not be sufficient to discharge said indebtedness, and the bank would be the loser by taking such conveyance. Both the Ridgelys either deny that such declarations were made, or say that they do not remember to have made them; but, whether made or not, a sufficient explanation of their meaning may be found in the contention as to the sufficiency or insufficiency of the property of Walker, at a public sale, to discharge his indebtedness to the bank.

Mrs. Watson says the deed which was subsequently agreed upon, and made by the said Walker and wife to said bank, was so made and given upon the express understanding that it was in discharge of the indebtedness of said Walker to said bank, and the assumption to pay the Bespham mortgage and the Pearson judgment. The "Dry House Lot" was omitted and left out of the deed because it was made apparent that the said Walker and wife would not make a deed to the said bank unless it was so omitted; and because it was shown that the costs of a sheriff's sale would equal, if not exceed, the amount which the bank would receive from a sale of the "Dry House Lot;" and because she (Mrs. Watson) had advanced about half the money to build the house thereon.

No agreement between the two Messrs. Ridgely, two of the directors of the Farmers' Bank, and Mr. Walker, has been proved to have existed previous to the meeting at the house of Mr. Walker spoken of by the witness, that the Farmers' Bank would take a conveyance of Walker's real estate, sell the same, and pay over the surplus of sales to Mr. Walker after his indebtedness to the bank was discharged. No such agreement has been proved to have been made or mentioned by any of the parties present at said meeting, and such an agreement is denied by the bank to have been made by it, or by any persons speaking for or on behalf of it; and such denial is also made by Dr. Ridgely, the president of the bank, and by Edward Ridgely, its attorney, witnesses in the cause; but the inference, perhaps, is sought to be drawn from the declaration said by Mrs. Watson and Mr. Richardson to have been made both by

Dr. Ridgely and Edward Ridgely, that "all the bank wanted was its debt," and the remark made by Mr. Walker : "He wanted the bank to be paid all he owed it." But it would be doing violence to the language used on that occasion to establish a fact, by inference, from language not remembered or denied or to support a theory, which is conclusive disproved by other controlling facts and circumstances.

It is proved that the board of directors of the bank, after accepting the proposition of Mr. Walker, and after their acceptance had been notified to Mr. and Mrs. Walker, refused to accede to Mrs. Walker's proposition, subsequently made to Edward Ridgely, attorney for the bank, that the bank should agree to pay over to her any surplus of sales of Walker's lands which should remain after the payment of Walker's indebtedness to the bank, and that said directors unanimously rejected said proposition, and their objection thereof was notified to both Mr. and Mrs. Walker before the execution of said deed.

There is a very significant fact connected with this matter which is worthy of consideration. It nowhere appears in the bill or proofs in this cause that Mr. Walker ever refused to execute a deed to the bank in conformity with his proposition to the bank, and which was accepted by it. It nowhere appears that he ever reconsidered his determination to sign such a deed. The whole difficulty in respect to the question of paying over any surplus that might remain after the payment of Walker's indebtedness to the bank to Mrs. Walker, and the delay in the preparation and execution of the deed, seems to have arisen out of the note addressed by Mrs. Walker to the attorney of the bank, and which he laid before the board of directors at their subsequent meeting. This is said not to censure the action of Mrs. Walker. She, as a prudent, sensible woman and wife, desired all the advantage of any contingency that might arise in the disposition of her husband's property by the bank. For this she certainly was not to be blamed, but to be commended. The result of this action, however, was the express refusal of the direct-

*O*

18

ors of the bank to agree to the proposition, when formally made, to pay over any such excess of surplus to Mrs. Walker or any one else; and its non-agreement thereto rests not in conjecture or inference, but rests in positive proof.

I do not think, therefore, on the proofs in this cause, that the deed from Walker and wife was procured by deception and fraud, as charged in bill. I do not see how it can possibly be that when the complainant and his wife executed the deed they should not have considered it an absolute deed in fee-simple; but I can readily perceive how it might have been possible for Mr. Walker, who had formerly and for many years been a depositor in said bank, and friendly in his personal relations with the directors, to have indulged the hope that there would be a surplus from the sale of the property conveyed to the bank after paying his indebtedness to it, and that the bank might, in the exercise of a generous spirit, pay over to him such surplus. But generosity, simply as such, is not an enforceable equity; its tribunal is in the human breast, and not in the courts of earth. But although the directors of the bank might have positively refused to pay over to Walker any surplus of sales of the real estate conveyed by him and his wife to the bank which might remain after the payment of Walker's indebtedness to the bank, yet if the principles of equity and good conscience, as administered in equitable tribunals, make it inequitable that the bank should retain such surplus, and not pay it over to Walker, this court will decree that it shall do so, notwithstanding such refusal by the bank.

Was there manifest unfairness by the bank in procuring the deed from Walker and wife? Was Mr. Walker compelled, in any manner, to sell to the bank otherwise than from the want of a better purchaser? Did he sell to the bank for less than others would have given? Was the consideration for the conveyance inadequate, and coupled with unfairness or oppression in any respect? These several questions must, in accordance with the proofs in this cause, be answered in the negative. As to inadequacy of price, there is

no proof that any greater amount had ever been offered for the several parcels; and the attempt to dispose of them by public sale by Walker, and the inability to realize an amount greater than that of the indebtedness to the bank, or even that amount, precludes the idea of such inadequacy of price, even if that is to be considered, when not coupled with unfairness in a sale.

I think it is manifest, from the reading of the testimony in this cause, that most, if not all, the alleged surplus of sales, was caused by the personal exertions and perseverance of some of the directors of the bank, and especially to those of Dr. Ridgely, their president. His keen business tactics are displayed in his negotiations with Mr. Everests, the purchaser of the mill-pond tract, by which $1,000 were secured beyond the purchasers' *ultimatum*, constituting nearly one-half of the surplus of sales remaining after deducting the amount of Walker's indebtedness to the bank, and the payment of the Bespham mortgage and the Pierson judgment. Mr. Walker would have had no right to demand the exercise of such vigilance on his own part, and could not claim a right to appropriate to himself its advantages.

There certainly was no expressed trust in this case. I do not consider that an implied one, or a constructive trust, arises or can be created from or out of the evidence in the cause. The decree is therefore in favor of the defendant.

*John P. Saulsbury* and *Beniah Watson*, for complainant:

Whenever the relation of mortgagor and mortgagee is once shown to exist, a court of equity views with distrust and disfavor any arrangement between them by which it is proposed to transfer the equity of redemption to the mortgagee. The parties will be held to their original relation, unless the transaction shall appear perfectly fair, and no advantage taken by the mortgagee by reason of his incumbrances. *Baugher v. Merryman*, 32 Md., 185; *Villa v. Rodriguez*, 12 Wall., 326.

No matter how absolute a conveyance may be on its face, if the intention is to take security for a subsisting debt, or for money lent, the transaction will be regarded as a mortgage, and will be treated as such. Parol evidence is admissible to show that an absolute conveyance was intended as a mortgage. *Baugher v. Merryman*, 32 Md., 185 ; *Villa v. Rodriguez*, 12 Wall., 326.

The mortgagee may become the purchaser of the equity of redemption, if he does not use his power over the estate to induce the mortgagor to part with it. In equity, a conveyance, in whatever form it may be made, will be treated as a mortgage whenever it appears to have been taken as a security for an existing debt ; and the inclination of a court of equity is, in doubtful cases, so to treat it, and to allow the grantor the benefit of redemption. *Baugher v. Merryman*, 32 Md., 185; *Cornell v. Pierson*, 8 N. J. Eq., 478 ; *Horn v. Keteltas*, 46 N. Y., 605 ; *Bentley v. Phelps*, 2 Woodb. & M., 427 ; *Hughes v. Edwards*, 9 Wheat., 489 ; *Taylor v. Luther*, 2 Sum., 228 ; *Flagg v. Mann*, Id., 489 ; *Babcock v. Wymon*, 19 How., 289 ; *Russell v. Southard*, 12 How., 139 ; *Morris v. Nixon*, 1 How., 118 ; *Reading v. Weston*, 8 Conn., 120 ; *Sellers v. Stalcup*, 7 Ired. Eq., 13 ; *Trucks v. Lindsey*, 18 Iowa, 504.

A parol trust may, in the absence of any prohibitory statue, be set up even against the grantee under a deed absolute on its face, and without any allegation in the bill that the trust was intended to be declared in the deed, and was omitted through fraud or mistake. *Hall v. Livingston*, 3 Del. Ch., 348 ; *Murphy v. Hubert*, 7 Pa. St., 420 ; *Bank v. Carrington*, 7 Leigh., 566, 576 ; *Fleming v. Donahoe*, 5 Ohio, 255, and cases cited in *Hall v. Livingston*, 3. Del. Ch., 348 ; *Pierce v. Robinson*, 13 Cal., 116 ; *Lodge v. Thurman*, 24 Cal., 385 ; *Gay v. Hamilton*, 33 Cal., 688.

That fraud may be inferred from facts and circumstances, or from the condition of the parties, is well established. *McCormick v. Malin*, 5 Blackf., 509 ; *Highberger v. Stiffler*, 21 Md., 338 ; 1 Story, Eq., Jur. §§ 192. 193 ; 1 Kerr, Fraud & M., 384; 2 Kent, Comm., 484 ; Hill, Trustees, p. 145.

The equity of redemption having been apparently destroyed, a court of equity will treat the defendant corporation as a constructive trustee for the balance in its hands. *Baugher v. Merryman,* 32 Md., 186 ; *Linnell v. Lyford,* 72 Me., 284 ; *Wyman v. Babcock,* 2 Curt., 386 ; *Dougherty v. McColgan,* 6 Gill & J., 276 ; *Henry v. Davis,* 7 Johns. Ch., 41 ; *Wilber v. Sanderson,* 43 Cal., 496 ; *Hyndman v. Hyndman,* 19 Vt., 10 ; *McLanahan v. McLanahan,* 6 Humph., 99 ; *Vanderhaize v. Hughes,* 13 N. J. Eq., 244 ; *Peugh v. Davis,* 96 U. S., 332. They further cited *Webb v. Rorke,* 2 Schoales & L., 676 ; *Ford v. Olden,* L. R., 3 Eq., 461 ; *Hyndman v. Hyndman,* 19 Vt., 12 ; *Villa v. Rodriquez,* 12 Wall., 339 ; 1 Perry, Trusts, §§ 192, 210 ; *Budd v. VanOrden,* 33 N. J. Eq., 147, 568 ; 1 Pow. Mortg., 151a ; Hil. Mortg., 42 *et seq.* ; *Hughes v. Edwards,* 9 Wheat., 494 ; *Morris v. Nixon,* 1 How., 121 ; *Strong v. Stewart,* 4 Johns. Ch., 167 ; *Slee v. Manhattan Co.,* 1 Paige, 48, 77, note ; *Westlake v. Horton,* 85 Ill., 229 ; *Crane v. Buchanan,* 29 Ind., 570 ; *Brogden v. Walker,* 2 Har. & J., 285.

*N. B. Smithers* for defendant :

Of the relation between mortgagor and mortgagee in England, see *Cholmondeley v. Clinton,* 2 Jac. & W., 183 ; *Knight v. Marjoribanks,* 2 Macn. & G., 10.

In Delaware a mortgage is but security for the payment of a debt ; it creates no trust, and establishes no fiduciary relation. The mortgagee has but a chose in action. *Cooch's Lessee v. Gerry,* 3 Har., 282 ; *Hall v. Tunnell,* 1 Houst., 326 ; *Cornog v. Cornog,* 3 Del. Ch., 416 ; *Ten Eyck v. Craig,* 62 N. Y., 421 ; *Hinkley v. Wheelwright,* 29 Md., 348. Text-books : 2 Sugd. Vend., (8th Amer. Ed.,) 412, bottom 689 ; 1 Jones, Mortg., §§ 711, 712 ; 2 White & T. Lead. Cas. Eq., 1985. United States supreme court : *Russell v. Southard,* 12 How., 154 ; *Peugh v. Davis,* 96 U. S., 335. There was no trust created by agreement of parties.

GRUBB, J.  This is an appeal by William Walker, the complainant below, from a decree of the Court of Chancery.  The said Walker having given a mortgage, executed by himself and wife, to the president, directors, and company of the Farmers' Bank a corporation of the State of Delaware, the defendant below, subsequently conveyed to said defendant, after a portion of the lands embraced in said mortgage had been sold by him, and released by the bank, the residue thereof, excepting a parcel called the " Dry-House Lot,"agreed to be omitted from the conveyance.  As to the consideration for such conveyance, the bank was, upon the execution thereof, to satisfy and discharge the said mortgage, and a prior one, called the " Du Pont Mortgage," assigned to it, and also to assume and pay absolutely a mortgage given by Walker to one Bispham prior to its said mortgage, and a judgment entered against him in favor of one Pearson subsequent thereto.  The bank at once took possession of the lands so conveyed, and shortly thereafter satisfied its two mortgages, and paid and had satisfied the said Bispham and Pearson liens, and, within three months after the delivery of the said conveyance, sold all the lands thereby conveyed, and realized a certain net profit or surplus by the transaction.  Subsequently, Walker sought, by his bill in chancery, to recover said surplus, but the chancellor dismissed his bill, and he has taken this appeal.  The contention of Walker, as shown by his bill, and in the argument, is (1) that there was an agreement, understanding, and intention that Walker and his wife should execute, and the bank accept, the said conveyance for the sole purpose of selling said lands, and liquidating and discharging said lien indebtedness out of the proceeds thereof, and refunding to him the net surplus, if any ; (2) that the said conveyance to the bank was procured by deception and fraud, and that had not Walker and his wife been deceived, they would never have made to the bank an absolute deed, as said conveyance on its face was ; that it was contrary to the understanding of Walker and his wife, when they made and executed the deed, that it should be an absolute deed in fee-simple ; (3) that the

bank so used the power derived from the relation of mortgagee and mortgagor, which existed between the bank and Walker at the time of making the conveyance, as unduly to influence and induce the latter and his wife to execute the same, and thereby obtained an unconscientious advantage over Walker, which the bank ought not, in equity and good conscience, to be permitted to retain; (4) that said conveyance should be construed to be in effect an equitable mortgage, and that the bank, as to any net surplus proceeds secured from the sale of said lands, and remaining after the discharge of said lien indebtedness, should be held in equity to be a trustee for Walker, and be required to refund said surplus to the said Walker, who claims the same as, in reality, the proceeds of his equity of redemption.    The bank, on the other hand, by its answer and in the argument, wholly denies that there was any such agreement, understanding, and intention, or that there was any such deception and fraud, or any such power and influence, unduly employed on its part; but, on the contrary, insists that there was an agreement, understanding, and intention of the parties to said conveyance that, as the consideration therefor, and upon the delivery thereof, the bank should immediately and absolutely discharge and extinguish all of the said lien indebtedness, and so relieve Walker of all liability therefor, whether said lands were sold or not or sufficient or not for that purpose; that the entire transaction on the part of the bank was in all things fair and frank; that it gave an adequate consideration for the property conveyed to it; and that Walker and his wife voluntarily and deliberately conveyed the same to the bank in fee-simple, absolutely and indefeasibly, free from any right to redeem or receive either the property itself, or any proceeds thereof, and upon the express understanding that the bank should not be required to refund any surplus to Walker, or any other person.    This controversy raises two principal inquiries: *First,* was said conveyance made to and accepted by the bank in conformity with such an agreement, understanding, and intention of the parties as is alleged by the bank, instead of in conformity with such as is alleged by

Walker? *Second,* if so, was said conveyance procured by the bank by means of imposition, undue influence, deception, and fraud, as alleged by Walker?

As the deed is absolute on its face, and as the consideration therefor is therein stated to be the sum of $26,000, it becomes necessary to resort to evidence *dehors* the deed for the purpose of determining the foregoing inquiries. The rule is now well settled that parol testimony is admissible for this purpose. *Peugh v. Davis,* 96 U. S., 336; *Hall v. Livingston,* 3 Del. Ch., 348; *Baugher v. Merryman,* 32 Md., 186; *Reed v. Reed,* 75 Me., 264; *Russell v. Southard,* 12 How., 147. It may therefore be regarded as an established doctrine that a court of equity will look, beyond the terms of the instrument, to the real transaction, and will give effect to the actual contract of the parties, and will treat a deed absolute in form as a mortgage, or a conveyance in trust for the payment of debts, or otherwise, in accordance with the object of the parties in executing and receiving the same: and also that, as the equity upon which the court acts, in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible. But where, especially in the absence of any deception, undue influence, or other fraudulent means employed to procure a deed absolute in form, a party relies upon parol extrinsic evidence to prove that there was an agreement, understanding, and intention of the parties thereto that said instrument should be in effect a mortgage or security for the payment of an existing indebtedness, or a deed of trust to sell the lands thereby conveyed for the payment of the debts of the grantor out of the proceeds thereof, in that case such parol proof must be clear, unequivocal, and convincing, or the presumption that the instrument is what it purports to be must prevail. *Coyle v. Davis,* 116 U. S., 112, 6 Sup. Ct. Rep., 314; *Hall v. Livingston,* 3 Del. Ch., 374; *Dwen v. Blake,* 44 Ill., 139. It is also an established doctrine that an equity of redemption is inseparably connected with a mortgage; that is to say, so long as the instrument is one of security, the bor-

rower has, in a court of equity, a right to redeem the property upon payment of the loan.   This right cannot be waived or abandoned by any stipulation of the parties made at the time, even if embodied in the mortgage.   This is a doctrine from which a court of equity never deviates.   Its maintenance is deemed essential to the protection of the debtor, who, under pressing necessities, will often submit to ruinous conditions, expecting or hoping to be able to repay the loan at its maturity, and thus prevent the conditions from being enforced and the property sacrificed.   This doctrine has found appropriate expression in the maxim, " once a mortgage always a mortgage."   But, nevertheless, a subsequent release of the equity of redemption may undoubtedly be made to the mortgagee.   " There is nothing in the policy of the law which forbids the transfer to him of the debtor's interest.   The transaction will, however, be closely scrutinized, so as to prevent any oppression of the debtor."   Especially is this necessary when the creditor has shown himself ready and skillful to take advantage of the necessities of the borrower. A release to the mortgagee will not be inferred from equivocal circumstances and loose expressions.   It must appear by a writing importing in terms a transfer of the mortgagor's interest, or such facts must be shown as will operate to estop him from asserting any interest in the premises. . The release must also be for an adequate consideration ; that is to say, it must be for a consideration which would be deemed reasonable if the transaction were between other parties dealing in similar property in its vicinity.   Any marked undervaluation of the property in the price paid will vitiate the proceeding."   *Peugh v. Davis*, 96 U. S., 332.   This rule respecting the transfer of the mortgagor's interest to his mortgagee is generally adopted in this country as well as in England, as is shown by a multitude of authorities which it is now unnecessary to cite.   But although courts of equity, in the application of this rule, recognize that the relation of mortgagor and mortgagee affords the opportunity, as well as the means, to the latter to oppress the former, yet they will not presume inequitable conduct or unconscientious advan-

tage where the circumstances attending the transaction furnish no evidence of the actual existence of either. They recognize that, in many instances, the mortgagor may derive great advantage from the transfer of his interest in the mortgaged property to the mortgagee. Accordingly, while taking due care to protect the mortgagor from oppression, they still avoid depriving him of possible benefit, by refraining from such a stringent application of the rule as would generally deter mortgagees from purchasing such interest. *Russell v. Southard*, 12 How., 154; *Knight v. Marjoribanks*, 2 Macn. & G., 14.

It was argued, in behalf of Walker, that the relation of mortgagor and mortgagee is a fiduciary one, to which the rule forbidding a trustee to purchase the property of his *cestui que trust* is applicable. This proposition is unsupported by authority. On the contrary, it is expressly discarded in *Webb v. Rorke*, 2 Schoales & L., 673, and in *Knight v. Marjoribanks*, 2 Macn. & G., 10; while its rejection is implied in the general adoption of the above-stated rule, recognizing the validity of the transfer of a mortgagor's interest to his mortgage. It is true that Lord REDESDALE, in *Webb v. Rorke*, extended the prohibitory rule respecting purchases by trustees to the case of a lease by the mortgagor to the mortgagee, although he, at the same time, expressly excepted from the operation of that rule the release to the latter of the equity of redemption. But in the subsequent case of *Hickes v. Cooke*, 4 Dow., 24, Lord ELDON does not appear to have concurred in Lord REDESDALE's extension of the rule; and it has since been questioned in *Knight v. Marjoribanks*, 2 Macn. & G., 13, and in *Ford v. Olden*, L. R. 3 Eq., 463. Accordingly, it may be stated, as the result of the authorities, English and American, that there is nothing in the relation of mortgagor and mortgagee which *per se* disqualifies the latter from purchasing the entire interest of the former in the mortgaged premises; and this is true, whether the mortgagee, at the time of such purchase, is or is not in possession of the premises. This conclusion was judicially declared by the Supreme Court of

the United States in *Russell v. Southard*, 12 How., 154, in the following carefully considered language: "A mortgagee in possession may take a release of the equity of redemption. But such a transaction is to be scrutenized to see whether any undue advantage has been taken of the mortgagor. Especially is this necessary when the mortgagee, in the inception and throughout the whole conduct of the business, has shown himself ready and skillful to take advantage of the necessities of the borrower. Strong language is used in some of the cases on this subject. But strong expressions used with reference to the particular facts under consideration, however, often repeated by subsequent writers, cannot safely be taken as fixing an abstract rule. We think that inasmush as the mortgagee in possession may exercise an undue influence over the mortgagor, especially if the latter be in needy circumstances, the purchase by the former of the equity of redemption is to be carefully scrutenized when fraud is charged, and that only constructive fraud, or an unconscientious advantage which ought not to be retained, need be shown to avoid such a purchase. But we are unwilling to lay down a rule which would be likely to prevent any prudent mortgagee in possession, however fair his intention may be, from purchasing the property, by making the validity of the purchase depend on his ability afterwards to show that he paid for the property all that any one would have been willing to give. We do not deem it for the benefit of mortgagors that such a rule should exist." In *Peugh v. Davis*, 96 U. S., 332, the Federal Supreme Court, in its latest consideration of this question, has adopted the view so carefully expressed in *Russell v. Southard*. There is nothing in the law or policy of this state respecting the relation of mortgagor and mortgagee requiring the rejection of this salutary and prevailing doctrine. In Delaware, between mortgagor and mortgagee, there is not any such fiduciary or other relation as will prevent the latter from purchasing the entire interest of the former in the mortgaged premises. In England and some of the American states, the early common-law doctrine prevails, to greater or less

extent, that the mortgagee has the legal title to mortgaged premises, and the right to immediate possession both before and after default, as well as the right of strict foreclosure. In this state this view has been greatly modified. Here a mortgage, though in form a conveyance of the land, is a mere security for the payment of money. The mortgagor in possession (as was Walker in the case before us) is a real owner of the land; and the mortgagee, before foreclosure, or possession of the mortgaged premises after condition broken, has but a chattel interest. *Cooch v. Gerry,* 3 Har. (Del.), 280; *Hall v. Tunnell,* 1 Houst., 320; *Cornog v. Cornog,* 3 Del. Ch., 416. It is therefore evident that, if the mortgagee may purchase the mortgagor's interest in England and elsewhere, where, under the early common-law doctrine, his means and opportunities for oppression and inequitable advantage are relatively greater than in Delaware, he may with equal if not greater reason and propriety be permitted to do so here. And it may also be observed that in a case like the present, where, at the time the controverted conveyance was made, the mortgagee had neither the legal title to nor the possession of the mortgaged premises, a less exacting scrutiny of the transaction may be necessary than where he has either or both of these, and consequently the greater means and opportunities for the coercion and oppression of the mortgagor.

Guided by the foregoing principles and rules in the consideration of the facts which are satisfactorily established by the evidence of record, the proper determination of this case is neither difficult nor doubtful. William Walker, prior to November 8, 1873, had been a heavy borrower from the bank. On that day he executed a bond and mortgage in favor of the bank to secure the principle debt of $22,406.37. His wife joined in the mortgage. Sixteen different parcels of land were conveyed by it. On March 23, 1876, an amicable *scire facias* was docketed between the bank and Walker and wife, and judgment was recovered by the bank against them for said sum of $22,406.37, with interest from April 18, 1875. On December 7, 1878, there being more than two years' interest

then owing by Walker to the bank, he, in a letter to it, disclosed that he was greatly embarrassed for want of means to pay the same, and therein offered to " deed the entire property," or to " do anything else that is fair and honorable " which the bank might propose. This proposal to convey his property was not accepted by the bank, and subsequently Walker procured the means to pay a portion of this interest. On January 1, 1880, he was still owing nearly two years' interest. On January 26, 1881, the interest on his indebtedness to the bank still being in arrear and unpaid, a *levari facias* was issued on said judgment to procure payment by sheriff's sale of the mortgaged premises; but proceedings thereon were subsequently abandoned, Walker having made arrangements for the payment of his arrears of interest by borrowing the necessary amount from Harry A. Richardson, his son-in-law. On February 8, 1882, the interest being again in arrear, a second *levari facias* was issued ; but, Walker having again procured from said Richardson the required sum for the payment thereof, this *levari* was also stayed. Richardson, about this time, informed Dr. Ridgely, the president of the bank, that he would make no further payment on behalf of Walker. Prior to this declaration, however, President Ridgely, and also his brother Edward Ridgely, who was both a director and the attorney for the bank, had frequently advised Walker to sell his land himself, or by a real estate agent, for the purpose of paying his debts, and relieving himself from the burden and distress which his constantly increasing indebtedness imposed upon him. Walker employed a real estate agent named Manche for this purpose, but Manche failed to make any sale, although President Ridgely had promised him additional compensation in case he succeeded. After Richardson's said declaration, and after Walker had been partially paralyzed, President Ridgely advised Richardson that it would be well for Walker, his father-in-law, to have him (Richardson) sell the lands for him as trustee, because considerably more could probably be realized from their sale in that way than by the sheriff. Subsequently to this advice,

Walker concluded to sell his lands at public sale for the purpose of paying the bank and his other creditors. On December 12, 1882, he published an advertisement that he would offer all his real estate, except a parcel of minor importance, at public sale, by his agent, the said Richardson, on December 26, 1882. The bank assented to this sale, and agreed to release the land sold thereat pursuant to an arrangement with Walker that the proceeds thereof should be applied to the liens of the bank according to their priority. The sale was well advertised, the day was favorable, the attendance was very good, and President Ridgely and several of the bank directors exerted themselves to make the sale successful in producing sufficient to pay Walker's indebtedness; but, at the prices bid for the various parcels, it became manifest that, if sold, the proceeds would not prove adequate for that purpose. Thereupon Walker, after six of the less valuable properties had been sold, instructed his agent, Richardson, to stop the sale, and accordingly the other and more valuable parcels remained unsold.

Six weeks thereafter, on February 6, 1883, Walker found that a sum equal to almost the entire proceeds of said sale, applicable to his principal indebtedness to the bank, would be required for the payment of its interest, then in arrear, and that he was destitute of other funds for this purpose. In other words, he realized that the time had at last come when a part of the security itself for the payment of the principal must steadily be consumed in keeping down the annual iterest. Discovering that he could realize neither enough from the income of his lands to pay his annual interest, nor sufficient from his attempted sale of them to fully discharge his total indebtedness, and believing that a sheriff's sale thereof would also prove inadequate for that purpose, Walker, on said 6th day of February, requested Dr. Ridgely, as president, and Edward Ridgely, as attorney, of the bank, to meet him at his own residence for the purpose of an interview respecting his indebtedness to the bank. At the date of this interview, the said bank's mortgage of $22,406.37 was a lien upon all the real estate of

Walker which had not been sold in December, and released by the bank as aforesaid.     Prior to this mortgage there were two other liens : a mortgage given by Walker and wife to C. I. DuPont, January 20, 1859, which was assigned to the bank, March 24, 1876, and on which there was still due about $3,000 of unpaid principal ; also a mortgage, subsequent to the Du Pont mortgage, given by Walker and wife, April 6, 1871, to secure the payment of $6,286.16, with interest, to C. P. Bispham.     Subsequent to the said bank mortgage of November 8, 1873, were the following liens : A judgment of A. Pearson against Walker entered in October, 1882, for an unpaid balance of $100 ; also two judgments held by Mrs. A. E. Watson, daughter of Walker, and also a judgment held by said Richardson, his son-in-law, which was subsequent to the bank mortgage, but collateral to a specific mortgage held by Richardson, and which mortgage was prior to the bank mortgage, and was the first lien on the Dry-House lot.     The amount then due on Richardson's mortgage, including interest, was about $800.     The value of said Dry-House lot was about $1,200, and its value, in excess of said mortgage, about $400.     At the said interview, Walker proposed to the Messrs. Ridgely that he and his wife would convey to the bank all of his real estate not sold at said December sale, and still embraced within the bank's said mortgage, except a parcel in Dover, called the " Dry-House Lot," and that, as the consideration for said conveyance, the bank should, upon the execution and delivery thereof, satisfy and discharge its said mortgage and the said Du Pont mortgage, and also assume and pay and have satisfied the Bispham mortgage and the Pearson judgment ; these being all the liens against the said real estate except the said two judgments of Mrs. Watson and the said judgment and mortgage held by Richardson, from the liens of which judgments Mrs. Watson and Richardson were to release the lands to be conveyed by Walker and wife to the bank.     This proposition was made by Walker, and there is no evidence that any proposition was ever made by the bank, through any of its officers or agents, to have Walker to convey the

said lands to the bank for any purpose whatsoever. Nor is there any evidence to show that it was not entirely voluntary. It is clearly proven that on former occasions Walker made kindred offers to the Messrs. Ridgely, respectively, and that they were not accepted because they did not think the bank should incur the trouble and uncertainty of the care and resale of the lands. Instead of being eager to obtain these for the bank, they were always anxious to have them sold by Walker himself, or by some real estate or other agent employed by him, in order that his indebtedness might thus be paid to it. Even upon this occasion, they declined to accept his offer, but agreed, after some discussion, to report it to the board of directors of the bank. The advantages to Walker of the bank's acceptance of his proposition were obvious. He saved the Dry-House lot from sheriff's sale under the bank's mortgage, and secured certain exemption from all personal liability for his entire indebetedness to the bank, and to those whose claims it was to assume and pay absolutely and at all hazards. Thus it was certain that Walker, in any event, would gain, and possibly that the bank might lose, by the transaction. Consequently Walker, during the interview, earnestly argued that the property he proposed to convey was worth more than enough to pay the mortgages of the bank and the leins it was asked to assume, and that his proposition might be accepted, and the Dry-House lot omitted from the conveyance, and saved to him, without risk of loss to the bank. The Messrs. Ridgely, however, although believing that the bank might resell the property more advantageously than one in Walker's situation, owing to its ability to give larger credit and more favorable terms to purchasers from it, still differed with him, and expressed the belief that the bank would probably lose by accepting his proposition. They urged, as they previously had done, that the bank wanted its money, and not his land, with the trouble and care it would impose, and that it would still prefer that he should sell it himself if he could do so for sufficient to enable him to pay his indebtedness to the bank. From this interview on February 6, 1883, the Messrs.

Ridgely proceeded immediately to a meeting of the board of directors of the bank, and submitted the proposition to Walker.   After Walker's failure to sell the lands, at his December sale, for enough to enable him to pay his indebtedness to the bank, the directors considered him insolvent, and believed that a portion of the bank's claims was in actual jeopardy.   The board were convinced that the exigencies of the situation required them either to accept Walker's proposition or order a sale by the sheriff.   They ascertained that the costs of a sheriff's sale of his lands would about equal the sum which the bank would propably receive from the sale of the Dry-House lot after deducting the amount of Richardson's prior lien upon it.   By accepting Walker's proposed conveyance, the sheriff's sale could be avoided, and the Dry-House lot saved to Walker. His said proposition, after careful consideraion, was accepted by the board, and Mr. Ridgely, their attorney, informed Walker and his wife of this determination.   With the knowledge of both him and his wife, Mr. Ridgely undertook the preparation of their deed to the bank, and of the releases of Richardson and Mrs. Watson of Walker's lands from the liens of their judgments.   While so engaged, Mr. Ridgely received a letter from Mrs. Walker, informing him that she had reconsidered her determination to sign said deed, and would not do so unless the bank would agree to pay to her any surplus that may remain after the payment of Walker's debts by a sale of the lands.   Upon its receipt, he stopped the further preparation of the deed, and at the next meeting of the board submitted the letter for their consideration.   It is clearly established that her demand for such surplus was presented to the board, and unanimously rejected, and that at the same meeting Mr. Ridgely, as attorney for the bank, was instructed by the board to inform both Mr. and Mrs. Walker that her said proposition would not be agreed to, and was also instructed by the board to proceed at once, and enforce the collection of the bank's mortgage by legal process. Whereupon he immediately visited the house of Mr. and Mrs. Walker, saw both of them, and, as he deposed, " told both of them

19

that he had received Mrs. Walker's letter, and had submitted the same to the board, and that the board had refused to agree to pay to Mrs. Walker, or to any one, any balance or surplus that might remain by a sale of the bank of the lands proposed to be deeded to it after the payment of Mr. Walker's debts." He also notified them, further, that he was ordered to go on and collect the mortgage, and that there would be a sheriff's sale of Mr. Walker's lands. In response, Mr. Walker remarked to him : "Oh, go on, and prepare the deed, and Mrs. Walker will sign it." Mr. Ridgely says he did not understand Mrs. Walker as assenting to this remark, but as still refusing to sign the deed unless the bank would accept her proposition. He states that he gave the said information and notice to both Mr. and Mrs. Walker before they executed (as they subsequently did) their deed to the bank, and more than a week before it was executed by either of them. The same day he ordered a third *levari facias* to be issued for the sale of Walker's lands by the sheriff, and was issued the next day, February 14, 1883. Shortly afterwards, Mr. Walker's daughter, Mrs. Watson, called upon Mr. Ridgely, and requested him to wait a day or two before proceeding with the sheriff's sale until her brother-in-law, Richardson, who was then absent, should have returned. This he consented to do. Upon his return, Richardson called upon Mr. Ridgely, and learned from him of Mrs. Walker's demand for the surplus, and of the bank's refusal, and instruction to proceed and sell Walker's lands at sheriff's sale. Richardson thereupon arranged with Ridgely to have the said deed and release prepared by a specified day, and said that he would then call for them, and that Mr. and Mrs. Walker would sign the deed. At the appointed time he called for the deed and releases, and the next day had the deed executed by Mr. and Mrs. Walker, and the releases by himself and Mrs. Watson, respectively, and afterward handed them to Mr. Ridgely, who delivered them to the bank, by which they were all accepted. Neither Edward Ridgely, nor any officer or agent of the bank, was present at the execution of said deed. It was exe-

cuted by the advice and under the supervision of Mr. Walker's son-in-law, Richardson, and in the presence of Mr. Walker's immediate family, and after he and his wife had both been notified of the bank's refusal to pay any surplus to Mrs. Walker or any one. With the exception of Mrs. Walker's said demand, there is no proof whatsoever that, prior to the execution of said deed, the payment of any surplus to Mrs. Walker, or any other person, was ever demanded or stipulated for, by or on behalf of Mr. Walker. Nor does it appear by the evidence of the record in this cause that Walker ever reconsidered his determination to execute said conveyance, or ever refused to execute the same conformably to his said proposition, as accepted by the bank, either before or after he and his wife were informed that the third writ of *levari facias* would be issued. In this connection it should be noticed that this suit is prosecuted in behalf of the alleged right and claim of Mr. Walker, and not Mrs. Walker, to said surplus, and that proof of any coercion of Mrs. Walker only will not avail the former in this proceeding.

The said deed was executed by Walker and wife, February 22, 1883. It conveyed to the bank in fee-simple nine of the sixteen parcels of land embraced within its said mortgage of November 8, 1873 ; six of said parcels having been released by the bank when sold by Walker at his said December sale, and the remaining parcel, the Dry-House lot, being omitted from this deed for the reasons stated. Said deed was absolute on its face, and no condition, defeasance, or trust whatsoever was expressed therein. The consideration money therein mentioned was the sum of $26,000 ; that being the estimated amount of principal debt and interest then due on the said bank and Du Pont mortgages. The real consideration for said conveyance, however, as shown by the testimony, was the sum of $32,351.33, being the aggregate of principal debt and interest due on the said bank and Du Pont mortgages, which the bank fully satisfied and discharged, and also on the Bispham mortgage and Pearson judgment which it assumed and paid, and caused to be

fully satisfied, upon Walker's executing said conveyance conformably to his proposition as accepted by the bank. The bank sold all of the several parcels conveyed to it by Walker within three months thereafter. It appears that the bank received less than one-fifth of the purchase money in cash, and that it had paid the Bispham mortgage before it had sold any of the said parcels, and had paid and discharged all of the specified liens, amounting to $32,-351.33, before it had sold scarcely more than one-third in value of all of said parcels. The witnesses for the bank testify that the consideration given to Walker was a fair and reasonable price for said property at 'the time of said conveyance, and also that the prices procured by the bank by its resale thereof were, under the circumstances, the fair value of the same. While the estimates of Walker's witnesses differ somewhat from those of the bank's witnesses, the latter appear to be corroborated by other evidence in the case. The evidence also discloses that the bank took considerable trouble to resell the property, and in some cases afforded great inducements to purchasers in the way of easy terms of credit; that it offered a real estate agent $500 to effect a sale of one of the farms, and that the prices obtained were the results of these efforts, and of the skillful and judicious management of President Ridgely aided by fortuitous and favoring circumstances. After paying and discharging the indebtedness of Walker, as aforesaid, there remained (less expenses,) as a profit or surplus from the bank's sale of said lands, as stated in its answer to Walker's bill of complaint, the sum of $2,271.26. But although it appears that said surplus, as well as a much larger portion of the proceeds secured by mortgage as aforesaid, have not yet been actually received in cash by the bank, nevertheless it must be presumed, in view of the facts shown, to have been adequately secured to the bank, and therefore it must be treated, for the purposes of this case, as if actually received. The facts established by the evidence of record do not support the contention of Walker. On the contrary, they maintain that of the bank, even under the strictest scrutiny of the entire transaction.

This case differs in essential particulars from all of those cited at the argument. It has none of the aggravated features—abuse of a confidential or semi-guardian relation, demand for the conveyance when the value of lands generally was abnormally depressed, and great inadequacy of consideration—which existed in *Villa v. Rodriguez*, 12 Wall., 326. Here there is neither the marked inadequacy of price, nor the express understanding that the surplus should be refunded, which mainly controlled the determination of *Baugher v. Merryman*, 32 Md., 185. Nor is there anything to indicate that the original indebtedness was to exist as a continuing obligation beyond the execution of the conveyance, as in *Linnell v. Lyford*, 72 Me., 284.

That this conveyance was, on its face, an absolute one, is admitted by Walker. It is not pretended that it was a conditional sale. It is not claimed that there was any defeasance, condition, or trust expressed therein. Nor is it contended that there was any express agreement or intention extraneously evidenced, by deed or otherwise, that Walker should be entitled either to redeem the land itself, or to recover any surplus of the proceeds of the sale thereof remaining after the bank's payment and discharge of his said indebtedness. It is clear that the conveyance was not intended to recognize and secure his said indebtedness as a continuing liability after its execution, for upon its delivery the whole of this was to be immediately discharged, and Walker's personal liability therefor absolutely extinguished. In reality, therefore, it was executed and accepted as an actual payment of said indebtedness, and not as a security for the payment thereof. It was not even a conveyance of all the land then embraced within the lien of the bank's subsisting mortgage, for the Dry-House lot was omitted therefrom. It was in fact a fresh contract for a new consideration, whereby Walker gained the Dry-House lot, and complete immunity from all personal liability, and the bank released said lot, satisfied its two mortgages, and assumed an absolute liability for the payment and discharge of the Bispham mortgage and the Pearson judgment, with

the possibility, and, indeed, apprehended probability, of reselling the lands conveyed to it for less than the aggregate indebtedness of Walker, which it thereby bound itself to pay and discharge, whether it could or not sell them for enough for that purpose.

But it is insisted that, though there be no proof of an express, yet there is of an implied, agreement, understanding, or intention on the part of the bank to take the conveyance of Walker's said real estate, sell the same for the purpose of discharging his said indebtedness out of the proceeds thereof, and pay over to him any surplus thereafter remaining. In behalf of Walker, it is urged that such proof is found in certain expressions which Mrs. Watson Mr. Richardson, in their depositions, say were used by the Messrs. Ridgely, respectively, during their said interview with Walker on February 6th, and in the course of the discussion of his proposition to convey his real estate to the bank. They testified that these expressions were as follows: "The bank is a rich corporation, and could dispose of or sell the lands of Walker more advantageously than he could, because it could give better terms and larger time in which to make payment than he could." "The bank did not want the said Walker's property for speculation, but simply to get its own money." "All the bank wanted was its actual debt, costs, and expenses," and "all the bank wanted was what the said Walker owed it." They also testify that Walker, during the said negotiations, declared on his part that "he wanted the bank to have all that he owed it." The Messrs. Ridgely either deny or do not remember that they used these particular phrases, but they give the expressions which they claim to have used, with an explanation of their proper meaning in their true relation to the said discussion. But, even if accepted as testified to by Walker's said witnesses, they are not sufficient, viewed in connection with other circumstances of this entire transaction, satisfactorily to prove such an implied agreement or intention as he seeks to establish. Indeed, considering that the chief contention during said interview was whether the Dry-House lot should be excepted from the convey-

ance, and whether the bank could safely accept the real estate of Walker in absolute discharge of its own indebtedness, and that which it was to assume, and whether it should take the trouble and risks of a successful resale thereof, the said expressions do not, of themselves, necessarily or reasonably warrant the implication claimed for them by Walker.    But there are other circumstances which completely negative and absolutely forbid the implication of any such agreement or intention as he has alleged.    Both Edward and Dr. Ridgely have shown that Walker, prior to said interview, had asked each of them, upon separate occasions, if the bank would take a conveyance of his property to sell the same, pay his debts out of the proceeds, and refund to him any remaining surplus, but that they expressed to him their disapproval of this proposition.    Again, although, under the bank's said agreement (which is proven by Walker's witnesses, Richardson, and Mrs. Watson, as well as by the Messrs. Ridgely) to assume and discharge, absolutely and in all events, all of Walker's said indebtedness, it was possible that the bank might either lose or gain by its resale of his lands, yet, since the bank was in fact apprehensive (owing, among other reasons, to Walker's failue to sell at private or public sale) that it would probably lose by such resale, it seems unreasonable to presume that it either agreed or intended to refund to him any profit which it might thereby gain.    But all doubt respecting this question is entirely dispelled by the bank's frank and express refusal, upon Mrs. Walker's demand for said surplus, to refund the same to her or to any one, and the execution of the conveyance by her and Walker after notice thereof.    By making said conveyance after notice of said refusal, Walker is estopped from justly claiming or maintaining that there was any such agreement or intention as he alleges. He is also thereby precluded from maintaining that, by reason of the alleged language and expressions of the Messrs. Ridgely, he and his wife were led to believe that the bank would accept said conveyance for the purpose claimed by him, and therefore were induced by deception and fraud to execute and deliver the same. Mr.

Walker seems to have had a vague expectation that his unfortunate condition might make him the subject of the bank's generous consideration. In fact, however, he had no reasonable ground for the belief that the bank either agreed or intended to refund to him any surplus or profit realized by its sale of his lands. It is a significant circumstance that even his own son-in-law and witness, Mr. Richardson, who was present at the interview when Walker's proposition to make said conveyance was discussed, and who also advised and supervised its execution, had no such belief or understanding; for in his testimony he declares: "I advised Walker and wife to execute the deed. I had no agreement or understanding about the bank's paying Walker any surplus over and above his indebtedness. I think that, at the time of the excution of the deed, Walker believed that all the bank wanted from him was to secure itself in the indebtedness he owed the bank, and that which was assumed upon making of the deed. But what understanding the bank had of paying any surplus to Mr. Walker, or whether there was a mutual understanding between the said Walker and the bank, I am not able to say."

Neither the agreement nor the deception alleged by Walker being proved, it remains to be considered whether or not the conveyance of his lands was procured by the bank through an inequitable use of the power acquired by it as his mortgagee. To support his contention that it was so procured, he relies upon two circumstances: *First*, the resolution of the bank to secure its claim by a sheriff's sale of said lands under the third *levari facias*; *second*, the profit realized by the bank from its resale thereof. But it has already been shown that Walker, before the bank had adopted and notified him of this resolution, had agreed to execute said conveyance, and that he had never, either before or after such notification, evinced any determination or desire to withdraw from or to rescind this agreement. It has also been observed that, even if Mrs. Walker were unduly influenced by this resolution of the bank, yet since Walker does not appear to have been so, such influence upon Mrs.

Walker alone could not avail him in this proceeding.   The closest scrutiny of the entire transaction, as disclosed by the evidence, fails to discover any desire, much less design, on the part of the bank to use either the *levari* or any other means derived from its relation as Walker's mortgagee to procure the conveyance to it of his lands. On the contrary, it demonstrates a constant and consistent desire on the bank's part to refuse such a conveyance so long as it was possible otherwise to procure payment of its claims, and to accept it only as its *dernier ressort.*   The fact is that Walker made the conveyance, not under the pressure of the bank or its *levari,* but under the stress of his own insolvent situation, which clearly disclosed that his lands, under his ownership and management, would neither produce income sufficient to pay his annual interest, nor sell for enough to pay his aggregate indebtedness to the bank.   It cannot be maintained that the use, *bona fide,* of a *levari facias* when the mortgagee has a well-grounded and reasonable apprehension of loss unless it immediately be issued and executed, is of itself an inequitable pressure upon the mortgagor, even though he be enfeebled in body or distressed in mind by his embarrassed condition.   In this State every one who executes a mortgage gives the right to the mortgagee to proceed, in case of default, by this prescribed mode of judicial sale, and make his debt out of the mortgaged lands.   It was the right of the bank, and a duty its directors owed to the stockholders, under the circumstances proven in this case, immediately to secure their debt out of Walker's property. They believed, and, upon the evidence of record, were warranted in believing, that his lands were probably insufficient for their full payment, and that, therefore, their debt was in jeopardy.   Richardson, his own son-in-law, also believed so presumably, for he refused to loan him any more funds for the payment of his interest, and, after the failure of his attempted December sale, advised him and his wife to execute the deed.   Walker himself said, and, as we must presume, believed, that his lands would not bring enough at a forced or sheriff's sale to pay the bank's lien and those prior there-

to.   By its advice, and by its actual efforts, the bank had earnestly aided his endeavors to sell by both private and public sale; but, notwithstanding all this, his endeavors were futile.   He had previously offered, and the Ridgelys, for the reasons they stated, had refused to accept, a conveyance of his lands to the bank in discharge of its claims.   He had repeatedly declared to them that he would convey his lands to the bank before he would permit any sale of them by the sheriff.   For years the bank has shown forbearance when its interest was in arrear, and its debt in jeopardy.   At last he could no longer reasonably expect its further forbearance, or justly object to its immediate resort to a sale by the sheriff for the payment of its jeopardized claims.   He was consequently confronted by the now unavoidable alternative of a sale to the bank or a sale by the sheriff.   He seemed to have an invincible repugnance to the latter,—whether from a sense of pride, or the conviction that he could realize greater advantage from a conveyance to the bank than from a sale by the sheriff, it is now needless to surmise.   He deliberately discarded the latter, and chose the former. He carefully considered and voluntarily resolved upon the terms he would propose, and invited the president and the attorney of the bank to his own house for the purpose of the negotiation.   The proposition came from himself, and not from them, or any other agents of the bank.   Though enfeebled in body by paralysis, it cannot be maintained that Walker's mind was impaired.  None of his witnesses say that, and in his own bill of complaint he declares that his mind was perfectly clear.   Nor can it be said that any fiduciary or confidential relation existed between him and the bank or its agents.   At this interview their relations were adverse, rather than of the former nature.   The bank was guarding its imperiled interests, while Walker was seeking to save as much as he could from the wreck of his fortune.   During this negotiation, as well as when the deed was afterwards executed, Walker was guarded by the presence of his family, and aided by the advice of his son-in-law, Richardson, who was his chosen agent and trusted counselor.

Throughout the entire transaction, Walker, and not the bank, was in possession of the mortgaged premises, and his knowledge of their value was presumably equal, if not superior, to that of the bank. Under these circumstances, he proposed the terms, as already stated, upon which he would make the conveyance, and which, as already shown, were, for mixed reasons of business necessity and considerate sympathy, accepted and duly performed by the bank. In view of the foregoing facts, it cannot justly or reasonably be held that the bank either procured, or evinced a desire to procure, said conveyance from Walker by an unconscientious use of the power of its incumbrance, or by any inequitable means.

Nor is the profit or surplus realized by the bank from its resale of his lands, whether considered alone or in connection with other circumstances established by the evidence, sufficient to support Walker's contention that said conveyance was so procured. For Walker's real estate the bank virtually paid the sum of $32,351.33; this being the aggregate amount of his indebtedness, which it agreed absolutely to discharge as the consideration therefor. It is not shown, and it cannot be presumed, that others would have paid more, or even so much, for said property. The bank's witnesses say that it was a fair and reasonable price for the lands at the time of the conveyance to it. At his attempted public sale in December, a few weeks prior thereto, Walker had failed to have even this much offered therefor. There is no certainty that he would have received so much at a sale by the sheriff under the bank's *levari*. In fact, he himself believed that he would receive less. The bank's actual profit, as shown by its answer, was $2,271.26. This was but one-fourteenth of the consideration given by the bank, and merely 7 per cent. profit upon the transaction, notwithstanding the risk it took, the large credits it gave, and the labor, skill, and money it expended in reselling the property and securing this gain. Judged by these facts, so small a percentage of profit is not sufficient to show that there was any actual inadequacy of consideration, and particularly that " marked undervaluation of

the property in the price paid " which is the criterion prescribed in *Peugh v. Davis*, above cited. Much less is it sufficient, alone and unaided by other circumstances of fraud or oppression (and none such was proved,) to support the complainant's allegation that the bank procured the conveyance to it by inequitable means. Taken in connection with the other facts proved in this cause, the price which Walker's property would probably have brought at a sheriff's sale under the bank's *levari* is the reasonable criterion by which this case should be judged. Walker, as well as the bank, believed, (and it was probable, as has been shown) that at such a sale his lands would bring less than his said indebtedness. Therefore the bank had the lawful right to an immediate sale of the mortgaged lands under its *levari*, and to purchase them at such sale in default of higher bidders. The exercise of this right Walker could neither legally object to nor equitably enjoin. This being so, it is unreasonable to conclude that the bank sought to procure Walker's lands by inequitable means, when, at a lower price, and in a way free from legal or equitable objections, it could procure them by a sale under its own *levari*.

Since Walker would obtain a certain discharge from his debts by his conveyance to the bank, instead of an uncertain one by a sheriff's sale, it is also unreasonable to hold that, by reason of said conveyance, he was the victim of an unconscientious advantage, when in reality he thereby secured a substantial advantage. To so hold would be a manifest misapplication of the equitable doctrine which has been established to preserve the mortgagor from disadvantage, but not to deprive him of advantage; and, if sanctioned by judicial authority, would generally deter mortgagees from purchasing from their mortgagors when to do so would be a benefit, and not to do so a serious detriment, to the latter. Having obtained an adequate consideration for the conveyance of his lands, Walker has no equitable right to receive the profit subsequently secured by the bank through the risk, care, credit, outlay, and skill which the successful resale of them cost it. Mr. Walker, like many unfortu-

nate mortgagors who may be enfeebled in body by his physical infirmities, and distressed in mind by his insolvent condition, is entitled to the sincerest compassion. But such considerations alone will not authorize a court of equity to enjoin or avoid a sale, or a purchase of the mortgaged premises by the mortgagee under his own *levari*, nor a purchase thereof by him directly from the mortgagor, under circumstances like those proved in this instance. Viewed in every aspect, and with the closest scrutiny, the circumstances here proved do not present a case which warrants the intervention of a court of equity in the complainant's behalf. They do not show fraud, actual or constructive. They establish neither an express nor an implied trust. Nor do they beget such an equity as raises a constructive trust on the part of the bank to restore its profit or surplus to Walker. There is no evidence of record which shows any such violation of the principles of equity and good conscience, as administered in equitable tribunals, as makes it inequitable for the bank to retain said surplus. Accordingly, the defendant below was justly entitled to the decree in his favor, and it should be affirmed.

COMEGYS, C. J., absent.

PAYNTER, J., (concurring.) A bond and mortgage was executed by William Walker and Eliza S. Walker, his wife, bearing date the 8th day of November, A. D. 1873, to the president, direc-. tors, and company of the Farmers' Bank of the State of Delaware for the sum of $22,406.37. The mortgage embraced and conveyed 16 different tracts or parcels of land. An amicable *scire facias* having been docketed between the bank and Walker and wife on this mortgage, March 23, 1875, a judgment thereon was recovered by the bank against them for the sum of $22,406.37, with interest from April 18, 1875. On the 26th day of January, 1881, a *levari facias* was issued on said judgment, the interest due on said mortgage and judgment recovered thereon being then in arrear; but the proceedings on this execution were afterwards abandoned, arrange-

ments having been made for the payment of said interest. On the 8th day of February, 1882, a second *levari facias* was issued on said judgment, the interest then being again in arrear. Proceedings on the second writ were also abandoned, Walker having provided for the payment of his arrears of interest the second time. Walker being the third time in arrear with his interest without having reduced in any way the principal of said debt, a third *levari facias* was issued on said judgment the 14th day of February, 1883. In the month of December, 1882, Walker sold five of the said tracts at public sale, and on the 22d day of February, 1883, he and his wife executed a deed of conveyance to the president, directors, and company of the Farmers' Bank of the State of Delaware for nine other tracts of the lands named in said mortgage; the lot known as the "Dry-House Lot" not being embraced in said deed of conveyance for reason not necessary to be stated here, but which fully appear by the deposition taken in this cause. The consideration named in the deed was $26,000, but the real consideration, according to the evidence in the case, was the release to Walker of his entire indebtedness to the bank, amounting at that time to $25,277.36, the payment by the bank of a mortgage of Walker in favor of Charles Bispham, amounting to $6,988.67, and the payment of a judgment of Abraham Pearson against Walker, amounting to $85. The Du Pont mortgage, the Bispham mortgage, and the Pearson judgment were liens upon the lands of Walker, but the Du Pont mortgage had been assigned to the bank prior to that time. The aggregate amount of Walker's indebtedness to the bank, and the prior liens which the bank assumed and paid on the 22d day of February, 1883, the date of said deed of conveyance, was the sum of $32,351.32. The bank afterwards sold all these nine tracts of land which were conveyed to it, as aforesaid, by Walker and wife, for prices aggregating the sum of $34,870. Three tracts sold for $31,500, and six sold for $3,370. It is admitted by the bank that the aggregate prices for which the said nine tracts were sold by the bank exceed the consideration price for which Walker and wife con-

veyed them to the bank to the amount of $2,271.26; but it is claimed in the answer that the greater part in value of these lands were sold on credit, and a large portion of the consideration price therefor remained unpaid. A bill in equity was filed by Walker, in his life-time, against the bank, to compel the payment of said excess by the bank to him which he claims was equitably due him. The chancellor made his decree in favor of the defendant below, and the case comes before the court of errors and appeals upon an appeal from the decree of the chancellor.

The question is the case is as to the effect of the deed of conveyance to the bank from Walker and wife. The solicitors for the appellant contend that said deed should not be allowed to have force and effect according to its import, but should be construed, as between the parties, to have the effect only of a mortgage to secure the subsisting debt; and, though the deed may be absolute upon its face, the fact of the bank selling the property for more than the real consideration for which said Walker and wife conveyed the same to said corporation, with other facts proved, and all the circumstances surrounding the case, raised a trust by which the bank was converted into a trustee to apply the consideration price for which they sold said tracts of land to the payment of the debts against Walker, viz., his debt to the bank, and the prior liens which the bank assumed and paid, aggregating the sum of $32,-351.32, and to pay the amount in excess of such last-mentioned sum which said bank received as the consideration prices of said several tracts to the said William Walker or his administrator. The solicitor for the respondent, on the other hand, contends that the evidence in the case will not justify the court in construing the deed of conveyance made by Walker and wife to the bank as mortgage only for the security of the subsisting debt, and that no trust was raised by the facts and circumstances surrounding the transaction, but that the deed was absolute upon its face as well as by the understanding and agreement between the parties, and that the entire contract and sale of said lands was complete in every respect by

which the title to said property was vested absolutely in said bank, with absolute power for its disposal or sale, and with no obligation at law or equity to pay over to appellant or his representative any surplus or excess over the real consideration price for which Walker and wife conveyed said property to the bank.

It becomes necessary, in discussing the questions involved, therefore, to ascertain, as far as possible, from the proof in the case, the intent of the parties at the time the conveyance was made, their objects and purposes, and all the facts and circumstances surrounding the making of the deed, and the methods used or practices employed to obtain the execution of that instrument. Mrs. Watson, the most important witness for the appellant, says the "deed was made by Walker and wife upon the express understanding that it was in discharge of the indebtedness of the said Walker to the said bank, and its assumption to pay the Bispham mortgage and the Pearson judgment; that, at an interview between Walker and some of the bank directors, it was stated by Edward Ridgely, the attorney for the bank, that the bank did not want the said Walker's property for speculation, but simply to get its own money, and that it was stated by either Dr. Henry Ridgely or Edward Ridgely, and assented to by the other, that the bank was a rich corporation, and could sell the property of the said Walker on better terms, and give longer time, and thereby secure a better price therefor, as a reason and argument to induce the said Walker and wife to execute a deed to the bank for the same; and it was several times stated that all the bank wanted was its actual debt and expenses." She also stated that " she was present in February, 1883, when Edward Ridgely called upon Walker in reference to the execution of a deed to the said bank. When Edward Ridgely came in, he stated that he had come to report the action of the directors of the bank upon the proposition which had theretofore been made to the bank, and that the bank had conceded to the exemption of the Dry-House lot if Mr. Walker and wife would make a deed to the bank for the other property." To an inquiry of Mrs. Watson as to whether the

execution of the deed could not be postponed until March, Mr. Ridgely, after some hesitation, said: "No, madam; the bank has ordered me to prepare the deed this afternoon, and have it executed at once." She also says: "The tenor of the conversation at this interview was that it must be done at once, or the bank would proceed to cause the said Walker's real estate to be sold by the sheriff, and that Mr. Ridgely said. 'I wish, Mr. Walker, that you could sell your property to advantage; for all we want is our money;' that, after the said interview, she made inquiry of him if it was the intention of the bank or its officers to sell the lands of the said Wm. Walker at sheriff's sale, and that the said Edward Ridgely said he had already ordered a writ of *levàri facias,* and that if it had not gone too far he would recall it, and wait until Harry A. Richardson would return home;" she having requested him to wait until Richardson's probable return. She states: "There was nothing said on that occasion about any surplus which might remain after paying the indebtedness of said Walker." According to Mrs. Watson's testimony, nothing was said in her presence about such surplus until a considerable time had elapsed after the execution of the deed to the bank. She states, further, that Harry A. Richardson brought the deed to Walker's house for execution, and that it was executed in her presence; that "the bank, through its officers, had before that time repeatedly threatened or said it would sell the real estate of Walker on its mortgage if Walker and wife would not make a deed to it;" that this was the third *levari facias;* that Walker was suffering from the effects of paralysis, which affected his limbs and conversation, making him nervous and excitable, and causing him much trouble about his business; that about a year after the deed was made, and the bank had sold the property, Mr. Edward Ridgely was sent for, and the question being asked him whether the bank was going to pay Mrs. Walker the surplus, a letter was written, at Mr. Ridgely's suggestion, to the bank for the surplus,—he at the same time saying that Walker had no right to such surplus; and that, after the bank had completed the sale,

20

Walker would sit on every Tuesday, being known as " Bank Day," at the front window, and was looking, as he said, for some one to inform him that the bank had made provision to pay him whatever surplus there was.

Harry A. Richardson testified as to an interview with Dr. and Edward Ridgely to arrange about liquidating the indebtedness of Walker with the bank after he (Richardson) had paid Walker's interest up to January 1, 1882, when the subject of Walker and wife conveying their property to the bank in discharge of said indebtedness was talked about; that Dr. Ridgely expressed the opinion that Walker ought to have all his real estate in Dover clear, after paying his indebtedness; that an estimate was made of each farm, piece, or tract of land then owned by Walker by Henry Ridgely, with a lead-pencil furnished by said Richardson,—the said estimate aggregating about $48,000; that Edward Ridgely concurred in said estimate, and said that at said estimate the said Walker could pay all his debts of record, and have all his town property clear; that there was an interview between William Walker and certain directors of the bank about the 1st of February, A. D. 1883, at which William Walker, Henry Ridgely, Edward Ridgely, Annie E. Watson, and himself (Richardson) were present; that Henry Ridgely and Edward Ridgely insisted upon a conveyance of all of Walker's property to the bank, but that he did not remember or know that any representations were made to induce Walker to make the deed, unless it was the statement, made by both of them at different times, that all the bank wanted was what Walker owed it,—this statement being made several times first by one, and concurred in by the other; that it was also said by Edward Ridgely, and concurred in by Dr. Ridgely, that the bank was a rich corporation, and could sell the lands more advantageously than he could, because it could give better terms; that a statement was made both by Henry Ridgely and Edward Ridgely, at the time of the conveyance of Walker's real estate to the bank, that the bank did not want the property for speculative purposes, but merely

wanted to liquidate his indebtedness to the bank ; that, about the time of issuing the third *levaria facias,* Edward Ridgely told him that, unless the deed was executed, the bank would proceed to sell Walker's real estate at sheriff's sale; that he could not get them to execute the deed, as Mrs. Walker refused to sign it unless the bank would pay the surplus, and wanted to know if he (Richardson) could not induce them to execute the deed, as otherwise the lands would have to be sold at sheriff's sale; that he would not have advised Walker and wife to convey the property had he not been informed by Edward Ridgely he would proceed to sell at sheriff's sale, and in order to avoid such sale; that he advised Walker and wife to execute the deed ; and that he had no agreement or understanding about the bank's paying Walker any surplus over and above Walker's indebtedness, and that question was not in his mind at that time.

On the part of the bank it is testified to by Edward Ridgely, and corroborated by Dr. Ridgely and other witnesses, that there was a general feeling of reluctance, on the part of the directors, to accept a conveyance of the said lands, because they did not want to be burdened with them,—to have the trouble of renting and attending to them, and of selling said lands.   That they greatly preferred that Mr. Walker should dispose of his lands himself, but were induced to think favorably of the conveyance, after his attempted sale, when it became evident that he could not dispose of the lands himself, and that the only alternative for the mortgagee was a sheriff's sale or a voluntary conveyance by Mr. Walker.   That the suggestion as to such conveyance was offered by Walker himself, and the proposition to execute the deed was made by him to the bank.   That they were present at the interview spoken of by reason of an invitation of Walker, and at his request. That neither the bank, nor any one connected with it, suggested such a conveyance, according to their recollection.   That there was nothing said about the surplus to the bank until the deed was in course of preparation, and that the bank immediately rejected the proposition,

refusing thereby to take the deed upon such conditions, but ordered their attorney to collect the mortgage by legal process. That no one connected with the bank was present when the deed was signed; Mr. Harry A. Richardson having attended to that part of the business, acting, not on behalf of the bank, but as the son-in-law of Walker and wife. That said conveyance was to be made and was made as an absolute conveyance to the bank. That there was no condition whatever to which it was to be subject. That there was no agreement or understanding whatever that either William Walker or Eliza S. Walker, or any other person, should receive, or be entitled to receive, any part of any moneys which the Farmers' Bank might obtain from the sale of said lands, or any part thereof. That the deed was executed after the bank had rejected Mrs. Walker's proposition that the bank should pay her the surplus. That the bank never, before or after the execution of the deed, acknowledged or recognized any liability upon its part to pay Mr. Walker such surplus or excess. That no demand was made upon the bank for such excess until a year had elapsed after the execution of said deed. That the consideration of the conveyance was the satisfaction of the bank's mortgages, and the payment of the liens against Walker, etc.; such satisfaction and payments to be made, not out of the proceeds of the sales of Walker's lands, but absolutely by the bank, whether it ever sold the said lands or not. That one of the Ridgelys might have said substantially that the bank could probably sell the lands better than Walker could, as it could afford to give longer credit than he could under the circumstances; but such language was not to induce Walker to convey the lands, because he himself had voluntarily proposed to make the conveyance, and the effort was on his part to get the bank to accept the conveyance with the Dry-House lot excluded therefrom. The directors at that time thinking the bank would lose a portion of its debt, the question of accepting them for speculative purposes did not enter into their minds. That the bank did not want the lands, preferring that Walker should sell them himself, but he had

attempted to make a sale, and had failed, when the alternative was presented to either sell at sheriff's sale or to accept Mr. Walker's proposition. That the bank was prevailed upon to accept the deed, considering the effect a sheriff's sale might have upon Mr. Walker, and other circumstances. That the estimate spoken of as to the value of Walker's lands ($48,000) was not made by Dr. Henry Ridgely, though it was in his handwriting; he simply acting as Mr. Walker's amanuensis, and the estimate being really that of Mr. Walker himself. The directors of the bank were unanimous in rejecting the proposition of Mrs. Walker as to paying her the excess of the sales over the indebtedness, and instructed their counsel to immediately inform Mr. and Mrs. Walker that the proposition would not be agreed to, and to proceed to sell the lands at sheriff's sale. That there was no condition to which the deed should be subject. That there was no agreement or understanding whatsover that either Walker or his wife, or any other person, should receive or be entitled to any part of the proceeds of the sales of said lands, and that Walker and his wife had been so informed before they executed the deed. That the price at which the bank took the lands was a fair and reasonable price at that time.

In viewing and weighing the testimony on both sides in connection with the arguments of counsel and authorities cited, we find the questions in connection with the deed are: (1) Was there any trust created either by agreement of the parties that the bank should sell the land conveyed to it, and, after paying the debts, refund the surplus or excess, or was there any trust raised by circumstances of circumvention, imposition, or fraud? It is impossible from the evidence in the case to arrive at the conclusion that there was such a trust created by express agreement of the parties, because the witnesses for Walker nowhere say in positive terms there was such an express agreement or contract, while Dr. Henry Ridgely, Edward Ridgely, Caleb S. Pennewill, Walter Morris, and Edwin M. Stevenson testify in the most unqualified and unequivocal language that there was no condition whatever to which it should

be subject, and that there was no agreement or understanding whatsoever that either the said William Walker or Eliza S. Walker, or any other person, should receive or be entitled to receive any part of any moneys which the Farmers' Bank might receive from the sale of said lands, or any part thereof; Dr. Ridgely also saying that Mr. and Mrs. Walker had been so informed before the execution of said conveyance.   It is also in evidence that the directors had rejected Mrs. Walker's proposition to pay her any surplus which might result from the sale of said lands by the bank, by a unanimous vote, and that said Walker and wife were notified of the bank's action.   Numerous authorities have been cited to show that, " whenever the relation of mortgagor and mortgagee is once shown to exist, a court of equity views with distrust and disfavor any arrangement between them by which it is proposed to transfer the equity of redemption to the mortgagee.   The parties will be held to their original relation unless the transaction shall appear perfectly fair, and no advantage taken by the mortgagee by reason of his incumbrance."   *Baugher v. Merryman,* 32 Md., 185 ; *Villa v. Rodriguez,* 12 Wall., 326.   No matter how absolute a conveyance may be on its face, if the intention is to take security for a subsisting debt, or for money lent, the transaction will be regarded as a mortgage, and will be treated as such.   *Baugher v. Merryman,* 32 Md., 185 ; *Villa v. Rodriguez,* 12 Wall., 326.

In determining whether a deed absolute on its face is to be allowed to have force and effect according to its import, or is to be declared, as between the parties, to have the effect of a mortgage only for the security of a subsisting debt, it is necessary to determine the manner in which the deed was procured, and the object and purposes contemplated by the parties at the time it was executed, as shown by all surrounding facts and circumstances.   For this purpose, parol testimony is admissible.   *Baugher v. Merryman,* 32 Md., 186 ; *Hall v. Livingston,* 3 Del. Ch., 348.   If a person obtain the legal title to property by circumstances of circumvention, imposition, or fraud, or if he obtains it, by virtue of a con-

fidential relation and influence, under such circumstances that he ought not, according to the rules of equity and good conscience, as administered in chancery, to hold the beneficial interest of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust, by construction, out of such circumstances or relation; and this trust they will fasten upon the conscience of the offending party, and will convert him into a trustee, and order him to hold it, or to execute the trust, in such manner as to protect the rights of the defrauded party, and promote the safety and interest of society. 1 Perry, Trusts, p. 191, § 166; Bigelow, Fraud, 190. It has been decided in this state, in the cases of *Cooch's Lesssee v. Gerry*, 3 Har. (Del.,) 282; *Doe v. Tunnell*, 1 Houst., 326; *Cornog v. Cornog*, 3 Del. Ch., 416,—cited by both the solicitors of the respondent and the chancellor in his decision below,—that " a mortgage is but security for the payment of a debt. The mortgagee has but a chose in action." It creates no trust, and establishes no fiduciary relation, without some circumstance of fraud, circumvention, undue influence, advantage overreaching, or other wrongful act.

The next question which arises in the case is a question of fact more than of law, and we are compelled to apply the principles of law as enunciated in the cases previously cited. It is well settled that fraud vitiates a contract in equity; that, to enforce a contract, one must go into equity with clean hands; that there must be no circumstances of circumvention, imposition, or fraud. The declaration of fraud, circumvention, grinding bargain, etc., spoken of in the complainant's bill, and argued so ably by his solicitor, must be susceptible of proof, before a court of equity, or any other court, will interfere. The solicitor for Mrs. Walker lays particular stress upon the statement of Mrs. Watson that the two Ridgelys said all the bank wanted was its money, that it did not want the land, that the bank was a rich corporation, and could sell the property to a better advantage than he could. The Ridgelys both say that they do not remember any such declaration made by them. In

the case of *Hinkley v. Wheelwright*, 29 Md., 348, the court decided : " Nor does the fact that parties stand in the relation of mortgagor and mortgagee prevent their dealing with each other as vendor and purchaser of the equity of redemption. Such transaction will not be set aside unless for manifest unfairness or inadequacy of consideration. The court also, in the case of *Hicks v. Hicks*, 5 Gill & J., 85, said that the mortgagee may become the purchaser of the equity of redemption if he does not make use of his incumbrance to influence the mortgagor to part with his property for less than its cash value. It has been held that conveyances from mortgagors to mortgagees are regarded with distrust. But there is no proof here that the bank made use of this circumstance to influence Mr. Walker to part with his property at less than its real value to that time. The preponderance of the testimony points directly to the contrary. The weight of the proof is that the bank was not making any effort whatever to obtain the conveyance, but all such suggestions came from Walker himself. All of the bank directors say there was no understanding or agreement that the bank should pay over or refund to Mr. Walker any surplus or excess it might receive from the sale of the property, and Mr. Harry Richardson himself says he does not remember any such understanding or agreement, because it was not in his mind at the time. It is proved that the suggestion to make the deed was made by Walker to the bank ; that the bank directors were loth to accept the deed ; that after awhile they became willing to accept it, and the defendants wanted them to except the Dry-House lot, and, after considerable hesitation, the directors agreed to exclude the Dry-House lot from the deed. Walker and wife were so informed, and the deed, ordered to be drawn. In the midst of the preparation of the instrument of conveyance, Mr. Ridgely was notified that Mrs. Walker would not sign the deed unless they agreed to pay the excess over the debts to her. The directors refused the proposition, and the deed was made to the bank without condition, as an absolute deed. The bank certainly had the legal

right to issue the third *levari facias*, and enforce its collection. Mr. Walker was naturally uneasy and troubled about his business, and preferred making the deed to being harassed with a sheriff's sale; but is nowhere proved that the bank issued the writ for any such intent and purpose, and more especially is it nowhere proved that the bank used such power to cause Walker to make a deed for a less consideration than it was worth at that time. Opinions are given by some witnesses that the property was worth more than it sold for to the different purchasers; but, on the contrary, it is distinctly proved that, only a short time prior to said sale by the bank, Walker, and Harry Richardson, were endeavoring to effect a sale of said property, but were compelled to abandon it. It was at this juncture that Walker flew to the bank again, and Dr. Ridgely says the consideration was as much as it was worth at that time. I can therefore see no circumstances of circumvention, overreaching, fraud, or attempt to enforce the mortgage by taking the property at less than its value at that time; and, according to the evidence in the case, the property was sold to the purchasers afterwards at an advance by shrewd and legitimate management. I cannot see where Walker can have any equity in the case because of the disparity of the consideration at the time the bank took the deed and the consideration for which it sold the lands. Such disparity was too small to be conscienceless,—being little, if any, more, after deducting expenses, than a real-estate agent's fees would have been, and little more than the costs of a sheriff's sale. From all the circumstances in the case, it appears that the bank was exceptionally lenient in collecting the mortgage, having resorted to three several writs of *levari facias* before enforcing the collection by a sale, having allowed interest in arrears to accumulate twice, having agreed to Walker's proposition to exclude the Dry-House lot, and, in truth, acceding to every demand or request made by Walker, except that of paying over the surplus. It must also be remembered that, during all this time the bank directors considered the claim in jeopardy. I am therefore of the opinion that the decree of the chancellor ought to be affirmed.

HOUSTON, J., (dissenting.)   Although it has been contended by the counsel for the respondent in this case that a mortgage in this state is but a security for debt, and has been so ruled even in our courts of law, and is therefore now no longer what it once was here, there is no doubt that doctrine was directly derived from courts of equity, in which it originated ; nor is there any doubt now, here or elsewhere, that the equity of redemption inherent in it was originally derived from the Roman law, and that it is purely the creature of courts of equity ; and we have the authority of both Chancellor Kent and Judge Story, the highest American authorities on the subject, for stating, as illustrative of some of the doctrines admitted into equity jurisprudence both in this country and in England, that under the civil law, although the debt for which the mortgage or pledge was given was not paid at the stipulated time, it did not amount to a forfeiture of the right of property of the debtor therein.   It simply clothed the creditor with the authority to sell the pledge, and reimburse himself for his debt, interest, and expenses, and the residue of the proceeds of the sale then belonged to the debtor.   This authority to make a sale might be exercised, not only when it was so expressly agreed between the parties, but when the agreement between them was silent on the subject.   Even an agreement between them that there should be no sale was so far invalid that a decretal order of sale might be obtained upon the application of the creditor.   On the other hand, if, by the agreement, it was expressly stipulated that, if the debt was not paid at the day, the property should belong to the creditor in lieu of the debt, such a stipulation was held void, as being inhuman and unjust.   These instances are sufficient to show some strong analogies between the Roman law and the equity jurisprudence of England on the subject of mortgages, and to evince the probability, if not the certainty, that the latter has silently borrowed some of its doctrines from the former source.   2 Story, Eq. Jur. §§ 1005, 1008, 1009, 1011 ; 4 Kent, Comm., 136, 138-140. Mortgages of real estate were of very early origin in England.   In

the time of Glanville, the mortgage of lands, as security for a loan, was in use, though during the feudal ages it was doubtless under the same check with the more absolute alienation of the fee, and both the alienation and mortgage of land were permitted only with the concurrence of the lord.    4 Kent, Comm., 136.    Kent further remarks:    "The English books distinguish between a *vadium vivum* and *vadium mortuum*.    The first is when the creditor takes the estate to hold and enjoy it, without any limited time for redemption, and until he repays himself out of the rents and profits.    In that case the land survives the debt; and, when the debt is discharged, the land, by right of reverter, returns to the original owner.    In the other kind of mortgage the fee passed to the creditor, subject to the condition of being defeated, and the title of the debtor to be resumed, on his discharging the debt at the day limited for the payment; and, if he did not, then the land was lost; and became dead to him forever.    This latter kind of mortgage is the one which is generally in use in this country.    The Welsh mortgages, which are very frequently mentioned in the English books, though they have now entirely gone out of use, resembled the *vivum vadium* of Coke or the *mortuum vadium* of Glanville; for though in them the rents and profits were a substitute for the interest, and the land was to be held until the mortgagor refunded the principal, yet, if the value of the rents and profits was excessive, equity would, notwithstanding any agreement to the contrary, decree an account."    Id., 137.    "It was a hard and unconscientious, but a lawful, contract; and Glanville, with primeval frankness and simplicity, does not scruple to condemn it as unjust, while he admits it to be lawful."    Id. note *c*.    "We have already had occasion," says Judge Story in his work before cited, "to take notice of the inconveniences attendant upon the creation of mortgages in fee, and of the substitution in their stead of terms for years.    But, in truth, whether the one course or the other was adopted, so far as the common law was concerned, the mortgagor was subjected to great hardships and inconveniences if he did not strictly fulfill

the conditions of the mortgage at the very time specified, as he thereby forfeited the inheritance or the term, as the case might be, however great might be its intrinsic value compared with the debt for which it was mortgaged. Courts of equity, therefore, acting upon their general principles, could not fail to perceive the necessity of interposing to prevent such manifest mischief and injustice, which were wholly irremedial at law. They soon arrived at the just conclusion that mortgages ought to be treated as the Roman law had treated them,—as a mere security for the debt due to the mortgagee; that the mortgagee held the estate, although forfeited at law, as a trust; and that the mortgagor had what was significantly called an equity of redemption, which he might enforce against the mortgagee, as he could any other trust, if he applied within a reasonable time to redeem, and offered a full payment of the debt, and all equitable charges." 2 Story, Eq. Jur., §§ 1012, 1013; 4 Kent, Comm., 140, 158, 159. The equity doctrine is that the mortgage is a mere security for the debt, and only a chattel interest, and that until a decree of foreclosure the mortgagor continues the real owner of the fee. The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law, and it is accordingly held to be descendible by inheritance, devisable by will, and alienable by deed, precisely as if it were an absolute estate of inheritance at law. The courts of law have also, by a gradual and almost insensible progress, adopted these equitable views of the subject, which are founded in justice, and accord with the true intent and inherent nature of every such transaction. Except as against the mortgagee, the mortgagor, while in possession and before foreclosure, is regarded as the real owner, and a freeholder, with the civil and political rights belonging to that character; whereas the mortgagee, notwithstanding the form of the conveyance, has only a chattel interest, and his mortgage is a mere security for a debt. This is the conclusion to be drawn from a view of the English and American authorities. The equity of redemption is not liable, under the English law, to sale

on execution as real estate.    It is held to be equitable assets, and is marshaled according to equity principles.    But in this country the rule has very extensively prevailed that an equity of redemption was vendible as real property on an execution at law, and it is also chargeable with the dower of the wife of the mortgagor.    On the other hand, the estate of the mortgagee, before foreclosure or at least before entry, is not the subject of execution,—not even though there has been a default, and the condition of the mortgage forfeited.    The English policy led to an early adoption of these just and reasonable views of the character of a mortgagor; and it was settled in the reign of Charles II. that the executor, and not the heir of the mortgagee in fee, was entitled to the mortgage money; for, as Lord Nottingham observed, the money first came from the personal estate, and the mortgagee's right to the land was only as a security for the money.    4 Kent, Comm., 160, 161.

Another doctrine of equity in relation to mortgages is that the mortgagee is entitled (unless there be some agreement to the contrary) to enter into possession of the land, and to take the rents and profits if he chooses so to do.    But in such cases he must account therefor towards the discharge of the debt, after deducting all reasonable charges and allowances.    So he may grant leases of the premises, and avoid any leases which have been made by the mortgagor subsequent to his mortgage.    Still he is treated so entirely as a trustee that he cannot exercises any right over the mortgaged property (such, for example, as the renewal of a lease) for his own benefit, but all acts of this sort done, and all profits made, are deemed to be for the benefit of the party who is entitled to the estate.    2 Story, Eq. Jur., § 1015.    The mortgagee in possession holds the estate with duties and obligations in some respects analogous to those of a trustee; and, if he takes the renewal of a lease, it is for the benefit of the estate, and not for his own benefit.    He can make no gain or profit out of the estate, which he holds merely for his indemnity.    4 Kent, Comm., 167.    And this, we may remark, has long been a cardinal rule in courts of equity, of general

application to trustees of every description; nor can there be any exception taken, we think, to the rule as above stated by Chancellor Kent, in its application to a mortgagee in possession of the mortgaged premises; for with all that has been said by eminent judges, both in courts of law and equity, with regard to the strict and critical propriety of denominating, in such a case, the mortgagee a trustee of the mortgagor, it is conceded by all, and well settled upon the authority of the leading case of *Cholmondeley v. Clinton,* 2 Jac. & W., 182, that it is, as least in equity, a trust *sui generis,* and of a peculiar nature, which is well defined in the able opinion of Sir Thomas Plumer in that case, in the following terms : " The ground on which a mortgagee is, in any case and for any purpose, considered to have a character resembling that of a trustee, is the partial and limited right which, in equity, he is allowed to have in the whole estate, legal and equitable. He does not at any time possess, like a trustee, a title to the legal estate distinct and separate from the beneficial and equitable. Whenever he is entitled at all to either, he is fully entitled to both, and to the legal and equitable remedies incident to both. But in equity his title is confined to a particular purpose. He has no right to either, nor can he make use of any remedy belonging to either, further than and as may be necessary to secure the repayment of the money due to him. When that is paid, his duty is to reconvey the estate to the person entitled to it. It never remains in his hands clothed with any fiduciary duty. He is never intrusted, with the care of it, nor under any obligation to hold it for any one but himself, nor is he allowed to use it for any other purpose."

As to what constitutes a mortgage, there is no difficulty whatever in courts of equity, although there may be technical embarrassments in courts of law. The particular form or words of the conveyance are unimportant; and it may be laid down as a general rule, subject to few exceptions, that wherever a conveyance, assignment, or other instrument transferring an estate is originally intended between the parties as a security for money, or for any

other incumbrance, whether this intention appears from the same instrument or from any other, it is always considered in equity as a mortgage, and consequently is redeemable upon the performance of the conditions or stipulations thereof. Even parol evidence is admissible in some cases, as in cases of fraud, accident, and mistake, to show that a conveyance absolute on its face was intended between the parties to be a mere mortgage or security for money. 2 Story, Eq. Jur., § 1018 ; 4 Kent, Comm., 142. And so inseparable, indeed, is the equity of redemption from a mortgage that it cannot be disannexed, even by an express agreement of the parties. If, therefore, it should be expressly stipulated that unless the money should be paid at a particular day, or by a particular period, the estate should be irredeemable, the stipulation would be utterly void. And a distinction is taken between a conditional purchase, or an agreement for a repurchase, and a mortgage properly so called. The former, if clearly and satisfactorily proved to be a real sale, and not a mere transaction to disguise a loan, will be held valid, although every transaction of this sort is watched with jealousy. 2 Story, Eq. Jur., § 1019 ; 4 Kent, Comm., 142-144, 159.

We are fully warranted in saying, we think, that the foregoing are all well-settled doctrines of the courts of equity in this country, and in this state also, on the subject of mortgages of real estate ; and, with these general principles thus settled and recognized in their application to the case now before us on appeal from the decree of the chancellor rendered in the court below, we will now proceed to consider the facts and circumstances in the case as presented in the evidence accompanying the appeal. And that presents, in its inception, on the part of Walker, the complainant below, the case of a debtor heavily indebted by a mortgage duly executed by himself and wife on much the greater part of all his real estate to the respondent below, the president, directors, and company of the Farmers' Bank of the State of Delaware, located in this town. Not only the time of payment fixed in the mort-

gage had elapsed, but he had at length failed to keep the annual interest on it paid up as promptly as the directors of the bank required, until the latter made known to him, through the president and the attorney of the bank, their apprehension that his real estate would not sell at public sale on the mortgage for enough to pay the debt, interest, and costs upon it, while he in reply asserted his belief that it would sell for considerably more than enough to pay all due upon it, and while professing an earnest desire to see the bank paid every dollar of the debt, and his belief that he would be able to do it if they would wait with him until he could realize another peach crop from his lands, and urged them to consent to it; and at their request, in an early interview between them on the subject, he furnished them with his own estimate of the value of the respective farms and tracts of land covered by the mortgage, which in the aggregate showed the sufficiency of it to pay the mortgage in full, and leave a surplus of a few thousand dollars remaining. The testimony of Mr. Edward Ridgely, a director and counsel and attorney of the bank, is that the directors were apprehensive that the debt of Walker to the bank, or some part of it, was in jeopardy, and that he was of that opinion; and the question of his solvency, and the safety of his indebtedness to it, had frequently been discussed at the meetings of the board of directors, and, as attorney, that he had received instructions to collect the mortgage in case the interest, which was from time to time largely in arrear, was not paid up or greatly reduced. That Mr. Walker was called on for the payment of the interest, and was requested to keep the interest paid up, and, if possible, to reduce the principal; and he thought that he and Dr. Henry Ridgely, the president of the bank, both called upon him several times for the purpose of getting him to pay the interest, and also to try to get him to make some arrangement whereby he might reduce the principal. Mr. Walker would reply, in substance, generally, that he was expecting a large peach crop and other fruit crops, and that, out of his crops which he was antici-

pating, he would be able to pay up all the accrued interest, and probably a part of the principal, "and would ask us to wait with him until he had a chance of realizing from his crops." The witness further says as follows : " I had several interviews with him in my office concerning his indebtedness to the bank. I think I had such an interview in January or February, 1881, and probably in January or February, 1882. I do not now remember who were present at any of said interviews, except that Mr. Walker and I and Dr. Ridgely, he thinks, were present at all of them. The purpose of all of said interviews was the same, and that was for us to talk with Mr. Walker about his indebtedness to the bank, and to try to get him to pay up the interest, and also to get him to pay some part of the principal, and to talk with him so as to see if we could not together suggest some plan to Mr. Walker whereby he might, to some extent at least, not only pay up the interest, but reduce the principal of his indebtedness. I do not know at whose suggestion all of these interviews were held. Some were held at the suggestion of Mr. Walker, some at the suggestion of Dr. Ridgely, and some, I think, at my own suggestion. Before any of these interviews of which I speak occurred, the bank had obtained judgment on the large mortgage. The first *levari facias* on said judgment was issued January 26, 1881, and the second was issued February 8, 1882, and the last and third writ of *levari facias* was issued February 14, 1883. I cannot say whether either of said writs was in the hands of the sheriff at the interview in my office in the early part of 1882, but my impression is that one of said writs was in the hands of the sheriff at the time of one of said interviews, but whether at the interview of 1881 or 1882 I cannot now remember. All of said writs of *levari facias* were issued in accordance with instructions, as the legal counsel of the said bank, because the interest on Mr. Walker's indebtedness to it was unpaid, and was growing larger every day, and his indebtedness thereby increasing. Proceedings were superseded on the first two of said writs because Mr. Walker made arrangements to pay the arrears of

21

interest on his indebtedness, or a large portion of such arrears of interest; and on the third and last writ proceedings were stayed because Mr. Walker and his wife had promised to convey most of their real estate to the bank, and afterwards did so." The witness further states that at these interviews, and he thinks at all of them, there were suggestions made as to what we considered the best mode of paying his debts to the bank, and that both Dr. Ridgely and he advised Mr. Walker to sell his real estate at private sale, and reduce his indebtedness. " We advised him, if he could not dispose of it himself, to put it in the hands of a real-estate agent to sell for him. We suggested to him that he had some valuable farms, which ought to find ready purchasers at fair prices. Mr. Walker would reply substantially agreeing to our propositions, and state that he was trying to dispose of a portion of his real estate; but he would further say that, if he could have a good peach crop, he would be able to pay his interest, and reduce his indebtedness, and almost every year he was expecting to have a large peach crop." He did not remember that, at any of the interviews with Mr. Walker in witness' office, there was any proposition or suggestion from anybody that he should convey his real estate, or any part of it to the bank; that neither Dr. Ridgely nor he, at any of the said interviews in his office, proposed or intimated any desire for or willingness to accept such a conveyance. He did not remember that the subject of such a conveyance formed any part of the consultation at any of the said interviews. It might possibly have been suggested at some of the interviews by Mr. Walker, but, if so, he did not remember it, and he knew that Dr. Ridgely and he were both anxious, at said interviews, to induce Mr. Walker to sell his lands himself, and that they at that time would not have been willing to have accepted a conveyance to the bank as they did not wish the bank to have the trouble of disposing of Mr. Walker's real estate.

But it further appears from the same deposition that afterwards Walker, with the consent of these gentlemen and other

members of the board of directors of the bank, made an attempt
to sell his real estate at public sale on the 26th day of Decem-
ber, 1882, after duly advertising the same, with the understand-
ing between him and them that the proceeds of the sale should
be applied to the debts of Walker according to the priority of
their liens, and with prices prescribed by the board of directors
for the several parcels, of it, which, if sold at said sale for said
prices or more, the directors would be willing to release the
parcels so sold from the lien of their mortgage. This sale, how-
ever, failed to realize the hope and expectation of either of the
parties to the understanding and agreement under which it was
attempted, and, in the opinion of the witness, the reasons as-
signed for Mr. Walker's having undertaken it were: *First*,
because he had been frequently urged to dispose of his real es-
tate by his brother, Dr. Ridgely, and himself; *second*, because
he had been afflicted by a stroke of paralysis, and was unable
to attend personally to his real estate; *third*, because he was
largely indebted, and he could not keep the interest paid, and
the debt was increasing; *fourth*, because his son-in-law, Mr.
Harry A. Richardson, has declined to provide any further means
for the payment of the interest to the bank; and, *lastly*, because
it was very evident to Mr. Walker that, if he did not dispose
of his lands himself, the sheriff would soon sell them for him.
And, in this connection, it is proper to observe that the wit-
ness states in another part of his disposition, that "when the
interest would be getting in arrear, and when I would say to
Mr. Walker that he must keep his interest paid, or that I
should be obliged, as attorney for the bank, to proceed on the
judgment which we had recovered on the mortgage, he would
say to me: 'Oh! there will be no sheriff's sale. I will deed
my lands to the bank first.' He had frequently made such re-
marks to me long before the date of the conveyance, and I am
certain as long or longer than two or three years before the date
of the conveyance. To all such remarks I would reply, sub-

stantially: 'Mr. Walker, we don't want your lands; we don't want to have the trouble of selling them. We want you to sell them yourself, and to pay your debts with the proceeds.'" And he further states, in his disposition, that the propriety of accepting from Mr. Walker a conveyance of his lands to the bank was first seriously considered and discussed by the board of directors after his attempted sale, which took place in December, 1882. The matter may have been talked about at some meeting of the board prior to said sale, but it was not seriously considered or discussed until some time after it. "Prior to said attempted sale by Mr. Walker, there was a general feeling of reluctance on the part of the board of directors to accept a conveyance of said lands; for we did not want to be burdened with the lands, and to have the trouble of renting them until they were sold, and of attending to them, and of selling them. We all greatly preferred that Mr. Walker should dispose of his lands himself. We were induced to think favorably of the conveyance by Mr. Walker of his lands to the bank after his attempted sale whereby it became evident to us that Mr. Walker could not or would not dispose of the lands himself, and the only alternative left for the bank was a sheriff's sale under the mortgage, or a voluntary conveyance by Mr. Walker to the bank. The subject of such a conveyance was brought to the attention of the board of directors upon the suggestion and proposition of Mr. Walker himself." It further appears from his deposition that "afterwards, on the invitation and request of Mr. Walker, another interview took place at his house in the early part of February, 1883, between the former and the witnesses and Dr. Ridgely, held for the purpose of discussing Mr. Walker's indebtedness to the bank, and to see if he could make some arrangement for paying it, at which Mr. Walker exhibited a statement in writing showing his opinion as to the value of his lands which were then unsold. My views as to the value of them did not correspond with his. His estimates were higher than I thought the lands would sell for. He had shortly before attempted

to make a public sale of his lands, and his estimates were consider-
ably higher than any one at that sale was willing to offer for them;
and the value of his lands had been pretty generally discussed by
persons who were acquainted with them. It was, I think, the
opinion of Mr. Walker that his lands unsold were sufficient to pay
his indebtedness to the bank. I differed from Mr. Walker's opin-
ion, and I did not think his lands then unsold were sufficient to
pay his indebtedness to the bank. I think I did express my opin-
ion that the bank would lose some of its indebtedness if we took a
conveyance from him, for I did not then think that the bank would
be able to sell the lands for enough to pay his indebtedness."

But it is unnecessary to dwell longer upon the evidence in the
case, except to say that, after the third writ of *levari facias* had
been issued on the judgment to sell the lands at sheriff's sale a
deed of bargain and sale was made and delivered by Mr. Walker
and his wife to the corporation of the bank for his lands then bound
by the mortgage, and, in consideration of the conveyance, the bank
was to satisfy the mortgage, and which was thereupon satisfied by
it, and thereafter the directors of the bank proceeded to sell and
convey the lands at private sales to various purchasers, and in a
period of about two years had so sold and conveyed all of them on
terms and at prices satisfactory to them; and for a sum exceeding
in the aggregate the amount of principal, interest, and costs then
due on the mortgage and judgment, $2,528.67, as I understand is
alleged here on behalf of the appellant, the complainant below.
And the bill was filed in the life-time of William Walker, the
mortgagor, against the president, directors, and company of the
Farmers' Bank of the State of Delaware, the mortgagee, to recover
that amount, on the ground that in equity and good conscience, and
according to the principles of equity jurisprudence applicable to
such a case between mortgagor and mortgagee, as this has been
proved to be, the excess or surplus of the sales over and above the
amount required to satisfy in full the principal, interest, and costs
due on the mortgage and judgment belonged to him, and not to

the bank. And the general and fundamental doctrines or principles of courts of equity in such cases, which I have already referred to and stated in this opinion, will sufficiently indicate the conclusion of my mind on the single question presented to us for decision in the case. For, as I understand the principle of equity ruled and recognized in so many of the cases cited in the arguments of the counsel on either side, both English and American, and particularly in the case of *Cholmondeley v. Clinton*, 2 Jac. & W., 182, I am clearly of the opinion that, as soon as the corporation of the bank became actually possessed of the lands mortgaged to it by Walker under the deed of bargain and sale from him and his wife to the bank, the bank became, in the peculiar and limited sense of the term, as employed and defined in that decision, the trustee of the mortgagor, the equity of redemption yet subsisting in him ; and, under the circumstances, the lands were in its possession for the sole purpose of paying the indebtedness due from him on the mortgage to the bank, and for no other ; and, as such trustee, the bank had not, and could not have, any right or title in this court, or in any court of equity, to use it for any other purpose, or make any gain or profit out of it whatever, because, when such a trust or relation exists between mortgagor and mortgagee, such is the jealous care with which courts of equity always have sought and still seek to protect the mortgagor against any abuse of the power or advantage which the mortgagee may have over him that they studiously seek even to prohibit such a possibility. The only consideration for the conveyance was that it was to be in full satisfaction of the indebtedness then due on the mortgage, and for that purpose was made by the mortgagor, and accepted by the mortgagee ; while the former had invariably contended, up to the time of the execution of it, that the lands conveyed by it was more than sufficient to pay the indebtedness, and the latter, through its agents and representatives, had as invariably dissented from his opinion, and expressed their apprehension and belief that the lands would not sell for enough to pay it ; and it was not until after the failure of the attempted sale

of them for that purpose by Mr. Walker that the board of direct-
ors of the bank was inclined to seriously consider the propriety of
such a conveyance from Mr. Walker.   And while there is no
ground to impugn or suspect the good faith or fairness of any
member of the board of directors for entertaining or expressing
such an apprehension up to that time, there was certainly good
reason from that time for a serious apprehension on their part that,
if the lands should be forced to a sheriff's sale on the execution,
they might fail to sell for a sufficient amount to pay the indebted-
ness, and thence to conclude that it was for the best interest of the
bank to accept the proposition, and to willingly assume the burden
and trouble of selling the lands as its own property at private sales,
as was afterwards done by them, at better prices than could have
been obtained for them at a sheriff's sale on the execution.

But, in the view which I take of the equity in this case, I
think far too much stress has been laid on the fact alleged that the
bank never promised or agreed to pay to Mr. Walker, or to any
other person, any surplus that might remain of the proceeds of the
sale of the lands by the bank after applying all that should be re-
quired of the proceeds to pay the debt, interest, and costs due on
the mortgage and judgment, because under the rule of equity ap-
plicable to such a case, the duty and obligation of the mortgagee,
as the trustee of the mortgagor for that purpose, existed wholly in-
dependent of any express contract or agreement between the parties
to that effect, because the duty and obligation was so imposed on the
trusee by the positive requirement of the rule of equity in such a
case; and it may even be doubted, to say the least, whether an ex-
press agreement between them to the contrary would not be held in
a court of equity to be inoperative and void.   But it clearly ap-
pears from the evidence in the case that it must have been under-
stood, and at least tacitly assented to, by the directors of the bank,
during the whole period of protracted pressure exerted upon the
mortgagor in this case to sell his lands himself, or to make some
arrangement whereby he might be enabled to pay his indebtedness

to the bank, that the proposed conveyance of them by him to the bank for that purpose was to be followed by a sale of them by the bank, and that the proceeds of the sale of them were to be applied to the payment of that indebtedness. This is to be inferred from the fact stated in Mr. Ridgely's deposition that he had repeatedly informed Mr. Walker that the bank did not want his lands, for several reasons, and the first of which generally assigned by him was that the bank did not want to have the trouble of selling his lands. Besides, we are not to suppose, with the estimate they then put on the value of them, and the fact alleged by him in his deposition that they were depreciating in value, that any member of the board ever thought of holding the lands under the conveyance as a permanent investment of the large amount of money then due on the mortgage. And, under the circumstances, we have no hesitation in saying that it was the duty of the bank to proceed to sell and dispose of them, as the directors have done, as fast as they reasonably and conveniently could do so, and at the best prices they could obtain for them. I do not think it necessary to refer to the temporary refusal, at the last moment of Mrs. Walker, the wife of Mr. Walker, to sign the conveyance without the consent and agreement of the directors to pay to her the surplus of the proceeds of the lands by the bank, if any, after paying the indebtedness due on the mortgage, not only because her demand was shortly afterwards abandoned by her, and she joined with her husbands in due and formal execution of the conveyance, but because Mrs. Walker had in her own right no claim or title whatever, legal or equitable to such surplus ; for the mortgage of her husband and herself to the bank had extinguished any prospective or inchoate right of dower which she might have had in the lands, and her persistence in the demand might have forced a sheriff's sale upon the mortgage, which it was now manifest both her husband and the bank were anxious to avoid. But I am of the opinion that the surplus belongs to Mr. Walker, the mortgagor, and should be paid to his administrator, the appellant in the suit.